UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:15-CV- 01608 (AVC) |
| v. | : | |
| YALE UNIVERSITY, ET AL. | : | |
| Defendants | : | MAY 4, 2016 |

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AND SECOND COUNTS OF PLAINTIFF'S COMPLAINT

## I.   Prefatory Statement

We know that Yale's investigation was a facade because Yale tells us so.  Plaintiff's transcript shows he was expelled on February 2, 2012, four weeks before the sham investigation was begun and 27 months before it was completed.

After paying tuition for 2.5 years of academic success at Yale University, Plaintiff became the victim of a student organized effort to take control of the Native American Cultural Center ("NACC").  False charges of sexual misconduct were used to dispatch Plaintiff from the NACC and from the University.  Yale played a part in that scheme by utilizing an investigative process that was so repeatedly incompetent that it creates the inference of intentional incompetence to justify a predetermined result.  The events leading up to Yale's prosecution of Plaintiff, the process of that prosecution, and the erroneous result - the expulsion of Plaintiff - satisfy the requirements to state claims under Title VI and Title IX.  Accordingly, Yale's Motion to Dismiss should be denied in its entirety.  Alternatively, because most of Yale's challenges to

the Complaint are based on mischaracterization of factual allegations as conclusions, leave to amend should be granted in the unlikely if the Court finds the current complaint wanting.

## II.   Introduction

Plaintiff properly pleads claims for relief under Title VI and Title IX.[1]  The Complaint details specific points of race and gender bias constituting discrimination against Plaintiff as a Native American, male student.  The Complaint alleges specific facts detailing Yale's deliberate indifference to John's educational rights in a flawed process reeking of selective enforcement and resulting in an erroneous outcome and a severe and unjust penalty.  Yale's investigation and hearing process, lasting 2.5 years and eviscerating John's right to educational opportunities, is shocking in its deficiencies and callousness.

Both Title IX and Title VI protect rights to educational access and require schools to prevent student-on-student harassment.  Yale failed to meet its statutory duties and was deliberately indifferent to sex-based and racially motivated harassment resulting in an erroneous outcome in John's case.  The United States Department of Education, Office for Civil Rights ("OCR") requires that "a school must take immediate and appropriate action to investigate or otherwise determine what occurred" because "a school has notice of harassment if a responsible employee knew, or in the exercise of reasonable care should have known, about the harassment."[2]

---

[1]  Yale does not seek to dismiss the state law claims in the Motion.

[2]  Dear Colleague Letter: Harassment and Bullying, U.S. Department of  Education, Office for Civil Rights,  October 26, 2010.

Yale's duties under Title IX and Title VI require addressing the merits of a complaint and ensuring that the complaint's filing is not itself a tool for racial or sexual harassment. When a school is indifferent to harassment occurring "under" its operations, and that deliberate indifference makes a student vulnerable to or causes the student to undergo harassment depriving the student of educational opportunities or benefits provided by the school, private Title IX and Title VI damages may lie. The deliberate indifference that leads to an erroneous outcome is both a Title IX and a Title VI violation.

In its Memorandum of Law in Support of the Motion ("Mem."), Yale exaggerates the required standards for motions to dismiss and goes so far as challenging the pleading because it lacks evidence. A court must consider a motion to dismiss in terms of a plaintiff's actual pleadings in the complaint, and not rely on a defendant's selective choice and characterization of the facts. For example, the Accuser and her friend's plan to take over the NACC at Yale was not, as characterized by Defendant, an "elaborate conspiracy." Rather, it was a very simple and successful (perhaps the best evidence of plausibility and factual accuracy) plan. Defendant's selective listing of Plaintiff's factual allegations fails to recognize that the allegations made on information and belief are supported by other facts.[3] Some lack named attribution to protect privacy concerns, similar to Plaintiff's non-use of the Accuser's name. Further, Defendants consistently challenge the sufficiency of the complaint by confusing or mislabeling ultimate facts

---

[3]    Most of the allegations made on information and belief were told to Plaintiff's investigators by persons either employed by, or students at, Yale. They were justifiably afraid of retribution, although most have now either graduated or left the University. Yale is aware of the identity of these individuals.

as mere conclusions.  When that error is corrected, most of Defendant's arguments lose their significance.

The Complaint alleges that the Accuser and John engaged in consensual sex on January 13, 2012 (the "Incident").  Accuser was then pressured to file a complaint against John as part of Dorame's plan to take over the NACC.  Yale then committed multiple violations of federal and state law by immediately effectively expelling John, then "investigating" for two and a half years.  To justify the expulsion, Yale conducted a pro-forma investigation and a sham hearing using that process to justify its predetermined decision to find John guilty of violating Yale's sexual misconduct policy and formally expel him.[4]  Yale's intentionally flawed and biased investigation and hearing resulted from its discriminatory animus.  Given what is actually alleged, including without limitation detailed facts showing gender stereotyping resulting in preferential treatment to the Accuser due to her gender, this case easily passes muster under *Yusuf v. Vassar College,* 35 F.3d 709 (2nd Cir. 1994).

After the Accuser filed the complaint against John on January 15, 2012, Yale had a duty to conduct a fair investigation to determine what had occurred, properly address the complaint and determine its validity within the requirements of Title IX and Title VI.  Yale did not investigate the validity of the allegation, as required.  Instead, Yale immediately barred Plaintiff from all Yale property, forced him to move out of his dormitory room and prevented him from attending classes, effectively resulting in his expulsion.  Yale's action on January 15, 2012,

---

[4] John's transcript (obtained a year prior to the end of the investigation and hearing process) shows that he was expelled a few weeks after the Incident, although the investigation was not begun until three weeks after the expulsion, the hearing process was not completed until twenty-seven months later and the final appeal two months after that.

before any investigation or hearings was arbitrary and denied John the access to education that Title IX and Title VI are designed to protect. Under such circumstances, Yale has liability at two independent points in time, namely at the time of the initial de-facto expulsion and 2-1/2 years later when it formally expelled John.

Ascertaining the truth or falsity of the sexual misconduct allegation was irrelevant to Yale's decision to deny access to education. The actual "disciplinary investigation" commenced on February 28, 2012, a month after John's effective expulsion, with the appointment of the "fact-finder." The "investigation" then continued for 26 months, violating Yale's own policies and required procedures. John was barred from all Yale property throughout the 26 months that the fact-finder "investigated" the allegations. Although required, Accuser refused to be interviewed for over two years and then, at the eleventh hour, was interviewed for less than 5 minutes, never answering any questions. The cloud of Yale's ongoing, unresolved investigation effectively prevented John from seeking an education at any similar school.

Yale relies on several Title IX cases, but their facts are readily distinguishable. Moreover, Yale's heavy reliance on *Doe v. Columbia Univ.*, 2015 U.S. Dist. LEXIS 52370 (S.D.N.Y. April 21, 2015) should be discounted because that matter is pending appeal before the Second Circuit, with oral argument recently completed. Plaintiff has alleged facts showing that Yale engaged in discriminatory conduct as an overreaction to adverse press on the subject. Yale's discriminatory misconduct, which they later attempted to cover up, constituted material breaches of Title IX and Title VI requirements. For these reasons, Plaintiff is entitled to compensatory damages and injunctive relief with respect to his educational records, which are now tarnished and which continue to cause ongoing damages to Plaintiff's future.

### III.    Facts Assumed To Be True For The Motion To Dismiss

#### A.    The Plaintiff

Plaintiff is male, Native American and identifies with the Lakota (Sioux) Nation. Complaint ¶ 7.  John worked in the NACC as part of his financial aid package, was Vice President of the American Indian Science and Engineering Society and accompanied the Dean of Native Students to recruit Native American students for Yale.  Complaint ¶¶ 17-21.  The Dean of Native Students ("Native Dean") also identifies with the Lakota (Sioux) Nation.  Complaint ¶ 23.

#### B.    The Tribal Unrest

The underlying dispute was a conflict between members of the Lakota and Navajo tribes, and Yale's misconduct involved favoring female Navajo students.   Accuser and other Navajo students (Dorame and Brown, specifically, "Navajo Group") wished to take control of the NACC and its funding to further their own interests at Yale.[5]  Complaint ¶¶ 22, 24, 26.  The Navajo Group planned to accomplish this objective by eliminating John, a supporter of the Native Dean, and replacing the Lakota Native Dean.   Complaint ¶¶ 25-26, 28-35, 136.  Following John's effective expulsion numerous complaints were made against the Native Dean.  Complaint ¶¶ 138, 141-142.  The initial allegations were found by Yale to be untrue. Complaint ¶¶ 141-142. During the winter break before Plaintiff's expulsion, the Navajo group discussed ways to get rid of John and take over the NACC and its funding.  Complaint ¶ 34.

---

[5] Defendant refers to this as "an elaborate plan."  It was not elaborate at all, and was successful.  Although Plaintiff is aware of the names of other Native students affected by the Navajo Group's actions, discovery will reveal additional Native students driven out of Yale or marginalized by the Navajo Group based solely on tribal affiliation.

### C.     The Dangerous Liaison

On January 13, 2012, Accuser went to a party at John's fraternity house. Complaint ¶ 36. Before going to the party, Accuser sent a text message to Dorame stating that she did not know "if this is such a good idea." Complaint ¶ 37. Accuser waited until John was finished with his duties working at the party's bar. Complaint ¶ 40. Accuser asked John to have sex with her in the upstairs bedroom, and John agreed. Complaint ¶ 41. Accuser asked John to obtain condoms. Complaint ¶ 43. Accuser and John engaged in consensual sex in the upstairs bedroom of the fraternity house after the condoms were obtained. Complaint ¶ 43. Accuser then asked John to take her to his dorm room. They dressed, and after a few minutes walked to John's dorm room to resume the sexual encounter. Complaint ¶ 44.

At the dorm room after Accuser and John disrobed, Accuser consensually gave John oral sex and then welcomed sexual intercourse. Complaint ¶ 45. When Accuser told John she wanted to take a break, John immediately stopped all sexual activity until Accuser re-initiated sexual intercourse. She gave John oral sex and put condoms on John's penis and engaged in intercourse. Complaint ¶ 46.

As Accuser started to leave John's room, she provocatively approached John and asked John if he wanted her to give him oral sex, again, before she left. John accepted Accuser's offer. Complaint ¶ 53. After some further interactions, Accuser left John's dorm room. Complaint ¶¶ 54, 55.

### D.     The Media Pressures Yale To Make Plaintiff A Sacrificial Lamb

During the month preceding Accuser's filing of the complaint against John, several published newspaper articles criticized Yale for its mishandling of a sexual misconduct allegation made against a former male athlete and criticized Yale for recommending that same

athlete for a Rhodes scholarship.  Complaint ¶ 64.  In the week prior to Accuser's filing of the complaint against John the New York Times published an article repeating the criticism of Yale. *Id*.

### E.    The Navajo Group Conspires To Take Over The NACC With False Allegations

On January 14, 2012, Dorame and Brown discussed convincing Accuser to file a false complaint against John for sexual misconduct.  Complaint ¶ 57.  Dorame told Accuser that if she did not make the false allegations against John, Dorame would do so herself.  Complaint ¶¶ 60, 62.  On January 15, 2012, at approximately 5:00 a.m., Accuser and Dorame went to the emergency room at Yale New Haven Medical Center and made a false claim that John had sexually assaulted Accuser in the early hours of January 14, 2012.  Complaint ¶ 61.  On or about January 15, 2012, Accuser made a formal sexual misconduct charge against John with Yale University.  Complaint ¶ 63.

### F.    Yale's First Violation Of Plaintiff's Rights

On the basis of the complaint filed by Accuser and before any investigation was conducted, John was immediately barred from the Yale Campus and all Yale property, and prevented from taking classes.  Complaint ¶¶ 77-78, 80.  No other student at Yale prior to John was denied access to educational facilities following a sexual misconduct complaint.  Complaint ¶ 78.  A student accused of attempted murder, who was neither Native American nor Filipino, was not barred from campus.  Complaint ¶ 159.  Yale had never expelled any other student for sexual misconduct.  Complaint ¶ 158.  Other students, who were neither Native American nor Filipino, who were formally accused of sexual misconduct using force were given no more than a four (4) semester suspension.  Complaint ¶ 158.

### G.     Yale's Second Violation Of Plaintiff's Rights

A "fact-finder" was appointed by Yale on February 28, 2012 (four weeks after John's transcript shows he was expelled).  Complaint ¶ 82.  On at least two occasions the Native Dean informed Yale administrators that the Accuser had filed false accusations in other situations and could not be believed.  Complaint ¶¶ 134, 146.  On May 20, 2014, over two years after the initial complaint was filed, the hearing panel recommended to Dean Mary Miller of Yale University that John be expelled based on Accuser's complaint.  Complaint ¶ 135.  On May 27, 2014, Dean Miller adopted the recommendation.  Complaint ¶ 147.  John provided notice that he wished to appeal the decision, and provided materials in support of the appeal.  Complaint ¶ 148.  The Yale Provost denied the appeal.  Complaint ¶ 144.  Despite the facade of an investigation, in an unusual act of candor, Plaintiff's transcript admits that Yale expelled him **before** its dog and pony show even started.  Complaint ¶ 145.

### H.     The Illusory Investigation and Hearing Process

Yale requires the UWC to *expeditiously* address a complaint.  Complaint ¶ 66.  The UWC took 2.5 years for this case, 800 days longer than the normal 60-day disciplinary process.  For over two years, the Accuser refused to be interviewed.  Complaint ¶ 96-97.  Bending over backwards, the chair of the disciplinary panel instructed the "fact-finder" not to contact Accuser directly.  Complaint ¶ 94.

Yale's procedure does not allow students involved in the disciplinary process to use attorneys; complainant and respondent are required to be interviewed directly.  Complaint ¶¶ 67-73.  However, Yale arranged for an attorney for the Accuser.  Complaint ¶ 94.  No attorney was provided for John.  In addition, the UWC chair instructed the "fact-finder" not to contact

Accuser directly. Complaint ¶ 94. Accuser's attorney was allowed to substitute for the Accuser in the Yale investigation. Complaint ¶ 87.

During the month of March 2012, on several occasions, the fact-finder met with the State's Attorney prosecuting John's case. Complaint ¶ 89-91. The Yale General Counsel's office obtained police reports from the State's Attorney and provided those reports to the fact-finder. Complaint ¶100. The permitted access to the criminal file demonstrated Yale's discriminatory intent. Accuser would not allow access to her 45-page Statement of Complainant to the New Haven Police Department or the medical records, but gave consent to Yale's fact finder to use only selective items of investigatory materials – the police arrest application and affidavit. Complaint ¶ 88. Under the circumstances, fairness dictated that Yale should have taken an "all or nothing" approach to records and required exculpatory as well as inculpatory information.

The fact-finder went so far as to attach portions of the police statement to her report, although these are not public documents. Complaint ¶ 155. Two years and three months later, Accuser, for the first and only time, appeared for the fact-finder's interview accompanied by her advisor. In her report the fact-finder stated that Accuser was in "tears," "weeping" and "unable to continue" almost immediately after the interview began.[6] Complaint ¶ 127. Accuser was then asked to validate the police investigation summary. Accuser's actual 45-page Statement of Complainant, on the other hand, is not part of the report. Complaint ¶ 99.

---

[6] UWC Procedures require the fact-finder to "conduct interviews as necessary to reach a thorough understanding of the facts and circumstances surrounding the allegations of the complaint." UWC, section 7.3, para. 1. That s impossible without interviewing the complainant.

"The hearing is intended to primarily allow the panel to interview the parties with respect to the fact-finder's report." Complaint ¶ 71. At the Yale "hearing," however, John was made to sit in a separate room and listen to the Accuser read her statement. Complaint ¶ 133. John was told that Accuser would not be answering any questions, and that therefore it was unnecessary for John to submit questions for the hearing panel to consider asking Accuser.[7] Complaint ¶ 132. John was deprived of his right to cross-examine his accuser, thus denying him fundamental due process. The UWC stated that Medical Expert reports (which had caused the State to drop charges against John over the Accuser's attorney's objections) submitted to the fact-finder, were found by the UWC panel to be of "limited value" because the reports were prepared by experts chosen by John. Complaint ¶ 123.

## I.      Yale Failed To Make Reasonable Efforts To Remedy Harassment.

The circumstances relating to John's relationship with the Native Dean and Yale's treatment of both John and the Native Dean comprise circumstantial evidence from which a racially motivated animus can be inferred: Accuser and other Navajo students filed false claims with Yale against the Native Dean. Complaint ¶¶ 136-137, 141. Yale found the accusations to be without merit. Complaint ¶ 141. Accuser filed a sexual assault complaint against John which resulted in his physical exclusion from campus and prevented his participation in Native American student groups. Complaint ¶¶ 63, 77. The Native Dean sent an email to UWC Chair Della Roca, on May 13, 2014, providing information regarding Accuser's truthfulness. Complaint ¶ 134. The Native Dean also met with Dean Miller providing information regarding

---

[7] UWC procedures section 7.4, para. 2 requires that "the panel will interview the complainant and then the respondent."

Accuser, thus putting Yale on notice of the racially motivated actions of Accuser.  Complaint ¶¶ 143, 146, 160.  Shortly after that meeting, on or about June 11, 2014, the Native Dean was removed from his position.  Complaint ¶¶ 143, 160.

The filing of the false complaint against John was driven by tribal motivations.  Yale advanced the racially-motivated tribal agenda by removing John from campus and then deviated from its established rules and procedures and failed to investigate the false complaint even after receiving notice of the racial animus.  Yale then justified the January 15, 2012 expulsion of John by holding a hearing that reached a pre-ordained conclusion.  With Yale's assistance, Accuser and others in the Navajo Group were successful in obtaining control of the NACC and its funding through the racially motivated removal of John from campus and removal of the Native Dean.

## IV.    Procedural History

The Complaint was filed in California State Court on April 25, 2015.  The Complaint asserts violations of Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, et seq. (first count), violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq. (second count), breach of contract (third count), promissory estoppel (fourth count) and negligence (fifth count).  Defendant Yale University removed the case from California State Court to the United States District Court for the Central District of California and then successfully moved for a change of venue transferring the case to the United States District Court in Connecticut.

Yale now moves to dismiss the first two counts of the Complaint, asserting that Plaintiff fails to state claims under Title IX because Plaintiff failed to allege particular circumstances suggesting gender bias and that Plaintiff fails to allege particular circumstances suggesting that

Yale's policies were inconsistently enforced due to gender bias.  For the reasons discussed herein

Yale's motion to dismiss the first two counts of the Complaint, should be denied or, in the

alternative, leave to amend should be granted to augment the complaint and cure any perceived

deficiencies.

**V.      Legal Standards To Review Yale's Motion To Dismiss**

In *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp.3d

550, 555 (S.D.N.Y. 2014), the court described the applicable legal standard:

> In reviewing a motion to dismiss pursuant to Rule 12(b)(6), this Court must
> accept the factual allegations set forth in the complaint as true and draw all
> reasonable inferences in favor of the plaintiff." *Cohen v. Avande, Inc.*, 874
> F.Supp.2d 315, 319 (S.D.N.Y. 2012) (citing *Homes v. Grubman*, 568 F.3d 329,
> 335 (2d Cir. 2009)). The Court will not dismiss any claims pursuant Rue
> 12(b)(6) unless the plaintiff has failed to plead sufficient facts to state a claim
> to relief is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
> 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), that is, one that contains "factual
> content that allows the court to draw the reasonable inference that the
> defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S.
> 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). More specifically, a
> plaintiff must allege facts showing "more than a sheer possibility that a
> defendant has acted unlawfully." *Id*. A complaint that offers only "labels and
> conclusions" or a formulaic recitation of the elements of a cause of action will
> not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Further, if a plaintiff has
> not 'nudged [its] claims across the line from conceivable to plausible, [those
> claims] must be dismissed." *Id*. at 570, 127 S.Ct. 1955.

*Id*.

Notably, when applying *Twombly* and *Iqbal*, the *Atlantica* court focused on whether

facts, accepted as true and from which reasonable inferences are drawn, had been sufficiently

alleged. The Court in *Atlantica*, and the U.S. Supreme Court in both *Twombly* and *Iqbal*, rejected

the idea that factual allegations of the Complaint could be ignored or derided as implausible

while calling the complaint conclusory.

In the Second Circuit, complaints containing specific factual allegations concerning events involving discrimination claims accompanied by conclusory allegations of discriminatory intent or animus suffice to state a discrimination claim. *See, e.g., Cortes v. City of New York,* 700 F. Supp. 2d 474, 484 (S.D.N.Y. 2010). Similarly, pleading facts alleged upon information and belief is not, as Defendant suggests, improper. (Mem.: 10-13.) *See Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2nd Cir. 2010) ("The *Twombly* plausibility standard . . . does not prevent a plaintiff from 'pleading facts alleged upon "information and belief"' where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible . . . ."); *Boykin v. KeyCorp*, 521 F.3d 202, 214-15 (2nd Cir. 2008)(the *Twombly* plausibility standard does not prevent pleading facts upon information and belief where the facts are peculiarly within the possession and control of the defendant). As long as plaintiffs have some factual basis for making an accusation and a reasonable belief in the truth of the allegations so pled, pleading the evidentiary details behind the accusation is not necessary if those details are under a defendant's control. *Arista,* 604 F.3d at 120-121.

As the court stated in *Doe v. Brown Univ.*, 2016 U.S. Dist. LEXIS 21027 at *26 (D.R.I. Feb. 22, 2016):

> In sum, the Court is not convinced as Brown would have it that the type of allegation found to be sufficient in *Yusuf* - that male students accused of sexual assault are "invariably found guilty, regardless of the evidence, or lack thereof," 35 F.3d at 716 - is now insufficient under *Iqbal* and *Twombly* absent some smoking gun evidence set forth in the complaint. As the court in *Yusuf* noted, "[s]imilar allegations, if based on race in employment decisions, would more than suffice in a Title VII case." *Id*. Requiring that a male student conclusively demonstrate, [*26] at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts.

14

> And while it may not contain a smoking gun of the type discovered by the plaintiff in *Washington and Lee*, Plaintiff's Complaint in this case does include specific allegations related to gender bias as opposed to bias against students accused of sexual assault.

The court then goes on to list allegations stated upon information and belief in the *Brown* complaint that meet the required pleading standard and which are similar to the allegations in the instant matter. *See also Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512-513; 122 S. Ct. 992, 994-95; 152 L. Ed. 2d 1 (2002) (before discovery has unearthed relevant facts and evidence, a plaintiff need not define the precise formulation of a prima facie case because that is a flexible evidentiary standard. It should not be transposed into a rigid pleading standard for discrimination cases); *see also Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013) (in a discrimination case, plaintiff need not plead facts sufficient to establish a prima facie case).

Courts have held that a complaint should be read as a whole, and not as a series of unrelated statements. *Doe v. Brown Univ.*, 2016 U.S. Dist. LEXIS 21027 at \*13-14 (*citing Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d at 55. The court must construe all well-pleaded facts liberally in favor of the party opposing the motion. *Scheur v. Rhodes*, 416 U.S. 232, 237; 94 S. Ct. 1683; 40 L. Ed. 2d 90 (1974). To survive a motion to dismiss, a plaintiff need not allege facts establishing each element of a prima facie case. The elements of a prima facie case provide an outline of what is necessary to make a plaintiff's claim plausible, and conclusory allegations are helpful so long as the specific factual allegations make the claim plausible. *EEOC v. Port Authority of NY and NJ*, 768 F.3d 247, 254 (2nd Cir. 2014).

Yale's motion is based on clearly erroneous standards. On multiple occasions, Yale criticizes the complaint for lacking "evidence" despite the fact that a pleadings motion is based on allegations, not evidence. Further, Yale suggests that the court construe factual allegations in favor of Defendant. For example, Yale argues that the Complaint's reference to Yale's zero

tolerance policy should be construed by the Court as a legally proper reason for the differences in how the Accuser and John were treated. (Mem.: 8.) Making an inference in Yale's favor would be improper in this context. *See Doe v. Brown Univ.,* 2016 U.S. Dist. LEXIS 21027, *24 (D.R.I. Feb. 22, 2016).

Yale's argument that the Complaint does not satisfy the legal requirement because some of the allegations are "conclusory" is flawed. To survive a motion to dismiss, a plaintiff need not allege facts establishing each element of a prima facie case of discrimination. The elements of a prima facie case provide an outline of what is necessary to make a plaintiff's claim plausible, and conclusory allegations can help identify the prima facie case of discrimination so long as the specific factual allegations make the claim plausible. *EEOC,* 768 F.3d at 254. Evidence of a discriminatory state of mind is not limited to direct evidence; discrimination can be proven by circumstantial evidence.

Yale's motion takes a selective listing of factual allegations made on "information and belief," invites the court to ignore pleaded facts and reach the conclusion that the Complaint does not satisfy the legal requirement of pleading. Yale's position is an overstatement and legally unsupported. The assertions based on "information and belief" are supported by factual assertions sufficient to pass *Iqbal* and *Twombly* muster. For example some of the allegations with respect to the Native Dean are alleged "upon information and belief." These paragraphs are accompanied by specific factual details on which the belief is formed and provide adequate notice to Yale of the basis of the relief sought by Plaintiff. Information or belief must be accompanied by supporting factual assertions. The courts of the United States have long held that allegations based on information and belief are legally valid and their use is allowed. *Berger v. U.S.,* 255 U.S. 22, 34-35; 41 S. Ct. 230; 65 L. Ed. 481 (1921) (value of information and belief

in the procedure of the law is recognized); *Arista*, 604 F.3d at 120.  This rule was not eradicated by *Iqbal* and *Twombly*.

In keeping with this liberal pleading standard, Plaintiff should be granted leave to amend if the Court determines additional factual allegations are necessary.  *Doe v. United States,* 58 F.3d 494, 497 (9th Cir. 1995); *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 553; 130 S. Ct. 2485; 177 L. Ed. 2d 48 (2010) (leave to amend should be freely given).  Plaintiff notes to the Court that many of the information-and-belief allegations were informed by statements from current and former students, faculty and employees of Yale who fear retaliation.  Yale is aware of the identities of many of those people.

## VI.    Plaintiff Properly Pleads A Claim of Title VI and IX Discrimination

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Title IX "is enforceable through an implied private right of action . . . for monetary damages as well as injunctive relief." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2nd Cir. 1994)(citations omitted).  A plaintiff must allege that the defendant discriminated against him or her because of sex, that the discrimination was intentional and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions."  *Yusuf*, 35 F.3d at 715 (emphasis in original) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2nd Cir. 2001)).  "It is well established that a school's failure to prevent or remedy sexual harassment of a student, including sexual assault, may violate Title IX." *Tolbert*, 242 F.3d at 366.  However, "it is equally well established 'that Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" *Tolbert*, 242 F.3d at 367 (quoting *Yusuf*, 35 F.3d at 715).  Since Title IX

17

is modeled after Titles VI and VII, Titles VI and VII legal precedent informs the application of Title IX.  *Cannon v. Univ. of Chicago*, 441 U.S. 677, 678, 99 S. Ct. 1946, 1948, 60 L. Ed. 2d 560 (1979).

The Department of Education has promulgated regulations, pursuant to Title VI, allowing disparate impact evidence to show discrimination.  Such disparate impact is available to Plaintiff to prove his Title VI claims in this case.  *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1407 (11th Cir. Ala. 1993); *Alexander v. Sandoval*, 532 U.S. 275, 149 L. Ed. 2d 517, 121 S. Ct. 1511 (2001).[8]

In *Yusuf* the Second Circuit held that plaintiffs attacking a university disciplinary proceeding on grounds of gender bias can be expected to fall generally within two categories.  In the first category, the claim is that the plaintiff was innocent and wrongly found to have committed an offense.  *Yusuf*, 35 F.3d at 715.  In the second, the plaintiff alleges selective enforcement.  *Id*.  The *Yusuf* standard is still applied and used as the controlling legal standard for a cause of action under Title IX by other courts.  *See Doe v. Brown Univ.*, 2016 U.S. Dist. LEXIS 21027 (D.R.I. Feb. 22, 2016); *Prasad v. Cornell*, Civil Action No. 5:15-cv-322, docket

---

[8] Relevant Department of Education Title VI regulations include 34 C.F.R. §§ 100.3(b)(2) and 100.3(b)(3). Section 100.3(b)(2) provides that:

[a] recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program, or the class of individuals to whom, or the situations in which, such services, financial aid, other benefits, or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.

number 32 at pg. 26 (N.D.N.Y. February 24, 2016); *Wells v. Xavier Univ.*, 7 F. Supp. 3d 746

(S.D. Ohio 2014); *see also Williams v. Franklin & Marshall College*, 2000 WL 62316 at *2

(E.D. Pa. 2000).  A Title IX claim is stated when the application of gender-neutral policies and

practices has been influenced by gender stereotypes. *Cohen v. Brown Univ.*, 101 F.3d 155, 178-

79 (1st Cir. 1996).  To this end, the court in *Cohen v. Brown Univ.* stated:

> To assert that Title IX permits institutions to provide fewer athletics
> participation opportunities for women than for men, based upon the premise
> that women are less interested in sports than are men, is (among other things)
> to ignore the fact that Title IX was enacted in order to remedy discrimination
> that results from stereotyped notions of women's interests and abilities. Interest
> and ability rarely develop in a vacuum; they evolve as a function of
> opportunity and experience.... [T]o allow a numbers-based lack of-interest
> defense to become the instrument of further discrimination against the
> underrepresented gender would pervert the remedial purpose of Title IX.

*Id.* at 178-79.

To support a finding of discrimination in an action brought under Title VII, the Second

Circuit noted, "[Title VII] also requires that, in the course of investigating such claims,

employers do not presume male employees to be 'guilty until proven innocent' based on

invidious sex stereotypes." *Sassaman v. Gamache*, 566 F.3d 307, 313-14 (2nd Cir. 2009).  Thus,

the use by a college or employer of stereotypes requiring that the female must be accommodated

and protected and the male is guilty until proven innocent, as shown by the facts alleged, support

a claim of discriminatory intent.  *See e.g., Bleiler v. Holy Cross*, 2013 U.S. Dist. LEXIS 127775

*16-17 (D. Mass. 2013).  Citing to the pleading standards of *Twombly* and *Iqbal*, Yale contends

that Plaintiff's Title IX and Title VI claims must fail because Plaintiff's allegations of gender and

race discrimination are conclusory and do not give rise to a plausible inference of gender and

race bias. (Mem.: 23-24.)

**A.    Yale's Reliance on *Doe v. Columbia* Is Misplaced**

Yale relies heavily on the opinion in *Doe v. Columbia*, 101 F. Supp. 3d 356, 2015 U.S. Dist. LEXIS 52370 (S.D.N.Y. April 21, 2015)(*Columbia*), claiming that case to be "indistinguishable" from the instant case.[9] Yale is mistaken as to the application of *Twombly* and *Iqbal*, mischaracterizes the Complaint and misstates the Complaint's factual similarity to *Columbia*. Critical examination of the Complaint's allegations as a whole and the controlling Title IX and Title VI standards lead to the contrary conclusion - that the Complaint sufficiently states Title IX and Title VI claims.

The facts alleged here state a much stronger case of discrimination than the facts recited by the District Court in *Columbia*: Columbia did not bar the male respondent from school after a sexual assault complaint, or during the entire 5-month investigatory process. Instead, Columbia issued a "no contact" order barring the male respondent from any contact with complainant. *Columbia*, 101 F. Supp 3d at 363-364. Following a disciplinary hearing, the male student was suspended until the fall of 2015, and not credited for his class attendance in the spring of 2014 up until the time of suspension. *Columbia*, 101 F. Supp 3d at 364-365. The "severe penalty" challenged in *Columbia* is a three (3) semester suspension imposed following a disciplinary hearing. This case is orders of magnitude different. Plaintiff was immediately effectively expelled upon Accuser's complaint filing; 27 months passed before the UWC issued its decision

---

[9] *Doe v. Columbia* is on appeal to the Second Circuit on multiple bases, including the improper treatment of Doe's allegations in supporting a claim for erroneous outcome. In light of other recent cases such a *Doe v. Brown*, *Prasad v. Cornell University*, 5:15-cv-00322-TJM-DEP (February 24, 2016), and *Doe* v. *Brandeis University*, 2016 U.S. Dist. LEXIS 43499 (March 31, 2016) *Columbia's* holding is aberrational in this context.

("Decision").  Yale's denial of educational access was continued while the disciplinary process went on for over two years.  In fact, Plaintiff's transcript in the instant case indicates he was expelled before (and therefore without) any formal procedures, investigation or hearing. Accordingly, Yale's reliance on *Columbia* is misplaced.

### B.     Yale Overstates *Yusef's* Standards.

Yale cites to *Yusuf* asserting that it establishes "necessary" allegations to support a gender bias claim.  Mem.: 7.  However, the Second Circuit was clear in indicating that their list was meant as a list of examples, stating:  "Such allegations <u>might include, inter alia</u>, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  *Yusef*, 35 F.3d at 715 (emphasis added).  Use of terms such as "might" and "inter alia" ("among others") clearly indicate that the Second Circuit was not intending to present an exhaustive list of factual categories necessary to support a Title IX claim.  Nor did the Second Circuit hold that the allegations in the complaint should be viewed out-of-context or in a vacuum when analyzing the plausibility of a Title IX claim.

The allegations of the Complaint establish Yale's discriminatory conduct based on Plaintiff's male gender.  A cause of action for intentional sex discrimination in violation of Title IX is pleaded in ¶¶ 86, 87, 88, 95, 96, 97, 99, 127, 131, 132, 133, 145, 151, 155 and 156, including specific facts going to gender bias including, but not limited to:

- Accuser was provided an attorney, while John was neither asked nor provided an attorney.
- Yale and the fact-finder stereotyped Accuser as the frail female victim while stereotyping John as the animalistic aggressor.
- Accuser was never required to be interviewed and was never asked questions, while John was interviewed twice and grilled by the UWC panel.
- John's evidence was ignored as self-serving while Accuser's uncorroborated statements where accepted as totally accurate.

- John was immediately effectively expelled as a danger to the community based on Yale stereotyping him as a dangerous male based solely on the female's uncorroborated accusation.

Yale made a credibility finding in favor of the Accuser from the moment the initial complaint was made Cmplt. ¶ 75, 77, 79 . Over the course of the next two years the Accuser was provided an attorney (Cmplt. ¶ 94), given a pass on answering any questions (Cmplt. ¶¶ 97, 99), and accommodated in every possible way, while John was barred from campus and living under a cloud of the ongoing investigation.  Cmplt. ¶ 77.  John's offer of numerous witnesses and actual evidence, including medical expert reports analyzing admissible evidence the Accuser refused to release to the fact-finder and that refuted the Accuser's allegations, was ignored (Cmplt. ¶¶ 94,   ).

The Supreme Court has repeatedly condemned gender-based discrimination based upon "archaic and overbroad generalizations" about women.  *Schlesinger v. Ballard*, 419 U.S. 498, 508, 42 L. Ed. 2d 610, 95 S. Ct. 572 (1975). *See, e.g., Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725, 73 L. Ed. 2d 1090, 102 S. Ct. 3331 (1982); *Califano v. Webster*, 430 U.S. 313, 317, 51 L. Ed. 2d 360, 97 S. Ct. 1192 (1977); *Frontiero v. Richardson*, 411 U.S. 677, 684-86, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (1973).  Yale's actions were based on the stereotype that male students are adults who have a choice and, thus, are the responsible party in sexual encounters, while they treat female students as children who never have a choice so they are never responsible in sexual encounters, which is exactly the type of generalizations the Supreme Court condemns.

Moreover, the complaint allegations should be viewed with consideration that discovery has not commenced.  The allegations must demonstrate a good faith basis for the belief that this pattern of discrimination will be made even clearer in discovery. S*wierkiewicz*, 534 U.S. at 506-

07; *Barrett v. Forest Labs., Inc.*, 39 F. Supp. 3d 407, 432 (S.D.N.Y. 2014) (in most cases, plaintiffs will be unable to provide reliable statistics before they have access to discovery).

**C.     Yale Has Liability Based On Its Flawed Process And The Erroneous Outcome**

Plaintiff has pled specific facts to support his claim that Yale evidenced a pattern of decision-making based on discriminating against male students, and against Plaintiff specifically because he is male, (*Yusuf*, 35 F.3d at 715), and that Yale's procedures governing sexual assault claims are "discriminatorily applied or motivated by a chauvinistic view of the sexes." *Mallory v. Ohio Univ.*, 76 F. App'x 634, 639 (6th Cir. 2003).   Plaintiff has also raised a plausible inference of a causal link between the Decision and gender bias based on the disparate treatment of evidence/witnesses received by Plaintiff versus the Accuser during the investigation.   The allegations pleaded in ¶¶ 75, 83, 86, 87, 88, 94, 96, 97, 99, 127, 131, 132, 133, 134, 145, 151, 155, 156 and 166 of the Complaint clearly connect the flawed outcome of the Decision due to gender and bias under *Yusuf*.

Plaintiff's claims are based on the systematic and institutional discrimination built into Yale's UWC procedures and the application of those procedures when it apparently and effectively presumed Plaintiff guilty at the outset of the process, barred him from campus, arranged an attorney for the Accuser while barring Plaintiff from having an attorney for the UWC process, ignored Plaintiff's evidence and witnesses, and allowed the Accuser's uncorroborated claims to go unchallenged throughout the entire process.

In contending that Plaintiff fails to allege that gender bias was a motivating factor behind the Decision, Yale relies on *Columbia*, notwithstanding the factual distinctions between *Columbia* and the case at bar, and the fact that *Columbia* is on appeal to the Second Circuit on

multiple bases.  Contrary to the *Columbia* court's treatment of the critical gatekeeper role of the investigator during the disciplinary process, the Second Circuit has held that the "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision .... even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the ... process." *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2nd Cir. 1999).  In this case the bias evidenced by the fact-finder fairly screams at the reader of her reports.

The "fact-finder" was charged with determining the scope of the investigation and preparing an impartial report.  No one reviews the fact-finder's work.  As the Complaint fairly alleges, the report reflects a clear and striking gender bias founded on stereotypes concerning women's sexual roles, likes and dislikes.  Following the investigation, the fact-finder report (and in this case a supplemental report) are submitted to the UWC.  *See*, UWC rules, 7.3, para. 3. Cmplt. ¶ 69.  The UWC does not engage in fact-finding itself, except as to any questions asked at the actual hearing.  *Id*. at 7.4.  Neither does the UWC have any input on how witness and fact summaries are written.  *Id*. at 7.3.  Moreover, the witness interviews are not recorded, so there is no opportunity to confirm the accuracy or seriously evaluate the fact-finder's reports.  Plaintiff's allegations describe how Yale's investigative process effectively adopts the Accuser's narrative, finding in her favor as soon as it received the complaint.  Cmplt. ¶¶ 77, 79.  Based on the Complaint's allegations as a whole, Plaintiff has sufficiently pleaded circumstances demonstrating that the UWC hearing process was tainted by the fact-finder's gender stereotypes, decisions of what witnesses to contact or not and utter failure to understand Native American

politics and communication norms, causing her to simply ignore facts and issues all to Plaintiff's detriment.

## VII. Plaintiff Properly Pleads A Claim of Title IX and VI Claims for Deliberate Indifference

### A. Title IX's Protected Activity and Yale's Duties.

Title IX prohibits discrimination on the basis of sex, including sexual harassment, in educational programs and activities. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277; 118 S.Ct. 1989; 141 L.Ed.2d 277 (1998). Sex-based harassment is a form of sexual harassment. *Meritor v. Vinson*, 477 U.S. 57, 64; 106 S. Ct. 2399; 91 L. Ed. 2d 49 (1986). Plaintiff has stated a claim of "deliberate indifference" under Title IX based on the guiding principles set forth in *Gebser*, 524 U.S. at 277 and *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644-45; 119 S. Ct. 1661; 143 L. Ed. 2d 839 (1999); *see also, Wells v. Xavier Univ.*, 7 F. Supp. 3d 746, 751-52 (S.D. Ohio 2014) (recognizing a claim for deliberate indifference where Plaintiff was found responsible for sexual assault, which resulted in his expulsion and a deprivation of access to educational opportunity at Xavier); *Peloe v. Univ. of Cincinnati*, No. 1:14-CV-404, 2015 WL 728309, at *14 (S.D. Ohio 2015) (plaintiff's deliberate indifference claim was based on the fact that a University official with knowledge of misconduct in the disciplinary proceedings failed to correct the misconduct because Peloe was male). This same analysis is applicable for claims of racial harassment.

The Supreme Court has held that a university may be liable if its deliberate indifference "subject[s]" its students to harassment. That is, the deliberate indifference must, at a minimum, "cause [students] to undergo" harassment or "make them liable or vulnerable" to it. *Davis*, 526 U.S. at 644-45. Liability for deliberate indifference rests on the idea that the university official

who had authority to institute corrective measures had actual notice of, and was deliberately indifferent to, the misconduct. *See Gebser*, 524 U.S. at 277.

The Department of Education clarified that gender-based harassment, including that predicated on sex-stereotyping, is covered by Title IX if it is sufficiently serious to deny or limit a student's ability to participate in or benefit from the program. Thus, harassment based on stereotyped notions of masculinity and femininity can form the basis of discrimination. *See generally*, U.S. Dep't of Education, Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX (2001) at p. v; 66 F.R. 5512. The filing of a false claim of sexual misconduct is sex-based conduct, and constitutes sexual harassment. Sexual harassment is conduct that is sexual in nature, it is unwelcome and denies or limits a student's ability to participate in or benefit from a school's education program. Harassing conduct takes many forms, including "graphic and written statements." A single or isolated incident may create a hostile environment. *See* U.S. Department of Education, Office for Civil Rights, Title IX Resource Guide (Apr. 2015), p.15.

Yale has duties, under Title IX, to both male and female students. The filing of a sex-based complaint by a female student did not eliminate its duties to (1) ensure that the complaint is not a tool of sexual harassment and (2) ensure that the male student is not disciplined without a fair procedure. *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F. 3d 1287, 1303 (11th Cir 2007) (Uncorroborated statements by complainant that are disputed by alleged harasser need not be credited after investigation). Yale violated its duty to the male student and barred him from campus. Cmplt. ¶ 77. This conduct is direct evidence reflecting Yale's discriminatory attitude. "Direct evidence [ ] is defined as 'evidence of conduct or statements by persons involved in the decision-making that may be viewed as directly reflecting the alleged

discriminatory attitude… sufficient to permit the *fact finder* to infer that that attitude was more likely than not a motivating factor in the [ ] decision. *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir 2004) *quoting Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999).

Throughout Yale's process Plaintiff was subjected to a series of UWC rules violations as a result of his male gender thwarting his ability to defend against Accuser's false claim. Cmplt. ¶¶ 86, 87, 88 – 91, 93, 94, 96, 97, 99, 100, 107, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 133, 134, 135, 146 and 147. The Complaint alleges facts showing that Yale did not take Plaintiff's position seriously and made no attempt to rectify the egregious errors. *Id*. The fact-finder, UWC Panel (relying on the fact finder's reports), Dean Miller and the Provost, although on notice of Accuser's true motives and the UWC's misconduct in the disciplinary proceedings, all failed to correct the misconduct because Plaintiff was male. Cmplt. ¶¶ 134, 143. Yale allowed Accuser's false allegations of sexual misconduct to go uninvestigated and barred Plaintiff's access to the educational opportunity to remain a student on Yale's campus. In eventually upholding the foreordained Decision, Dean Miller and the Provost were "deliberately indifferent to known acts of harassment" against Plaintiff, and Yale is liable for damages under Title IX. *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259-60 (6th Cir. 2000); *Davis*, 526 U.S. 644-646.

In the context of Yale's sexual misconduct policy, both the accuser and the respondent have equal access rights to Yale's educational programs and activities. Yale had a duty to both the accuser and the respondent, to conduct a prompt, thorough and impartial investigation of the claim. *Baldwin*, 480 F. 3d at 1303. Yale's duty to the accuser required Yale to address the

stated claim to determine its merits. *Id*. Yale also had a duty to respondent to prevent sexual harassment via the use of a false claim. *Id*.

Plaintiff stated facts to show that the sexual activity was consensual. Complaint. ¶¶ 36-55. Plaintiff also stated facts to show that the Accuser and the Navajo Group planned the filing of a false sex-based complaint against John as part of a plan to take over the NACC and its funding. Complaint. ¶¶ 22, 24, 25, 26, 34, 57, 60, 62, 65, 136-142. Thus, an investigation would have identified that the complaint of sexual misconduct was false, and was made for the purpose of depriving John access to educational opportunities and participation in Native American groups therefore constituting race based harassment.

**B.      Yale Denied Plaintiff Access To Education on the Basis of A Sex-Based Claim.**

John was barred from all Yale property when the complaint was first made. At that point Yale committed a "tangible action" with respect to a protected right under Title IX. *See Burlington Industries Inc. v. Ellerth*, 524 U.S. 742, 761; 118 S. Ct. 2257; 141 L. Ed. 2d 633 (1998) (a tangible action is a decision causing significant change in benefits). The denial of access to education was based solely on the filing of the racially motivated sex-based complaint. The denial of access to education continued during the investigation which lasted for two and a half years.

**1.      Yale Had Notice of the Harassment.**

The Complaint states facts showing that the Accuser and the Navajo Group wished to take control of the NACC and its funding to further the interest of the Navajo Group at Yale [Complaint ¶¶ 22, 24, 25, 26, 34, 57, 60, 62, 65, 136-142.], and the Navajo Group planned to accomplish this objective by taking actions to replace the Native Dean and to make untrue sex-

based allegations against John, a supporter of the Native Dean. Complaint ¶¶ 25-26, 28-35, 136. Thus, the false sex-based complaint was racially motivated. A school has notice of harassment if, "in the exercise of reasonable care should have known, about the harassment." *See* OCR's Sexual Harassment Guidance, *supra*; *see also* Dear Colleague Letter, October 26, 2010, fn. [9]. Yale failed to investigate John's assertions even after receiving notice.

### 2. Yale's Action Was Severe, Objectively Oppressive and Deprived John of Educational Opportunities for over Two Years

The Accuser refused to be interviewed for over two years. Complaint ¶¶ 96, 127. Yale instructed the fact-finder not to contact the Accuser directly. Complaint ¶ 94. Yale's UWC rules state that "the formal complaint process should take about 60 days." Complaint ¶73. The intransigence of the accuser is not one of the exceptions set forth in section 7.8. *Id*. Yale continued its investigation for two and half years and continued to bar John from school. Complaint ¶ 98. The investigation continued one year past the time John would have graduated from Yale had he not been barred from school.[10] The unresolved investigation also deprived John of educational opportunities from other educational institutions. The continued disciplinary investigation in itself was harassment, and unreasonable due to the complete denial of access to education.

It should be noted that if Yale had treated Plaintiff like similarly situated accused students, and merely issued orders to stay away from the Accuser, Plaintiff would have

---

[10] John began his enrollment at Yale in August of 2009. Complaint ¶ 11. The physical disbarment from school occurred on January 15, 2012 (Complaint 77), in the second semester of his junior year at Yale.

graduated before the investigation concluded and, therefore, the investigation would have been rendered moot.

### 3.    Yale Was Deliberately Indifferent and Liable for Damages

Yale violated its duty to John by its indifference to the false claim and its motivations and remained indifferent for over two years while Accuser refused to be interviewed during the ongoing investigation.  Where the school is deliberately indifferent to sexual harassment, and the harassment is so severe, pervasive and objectively offensive that it can be said to deprive the victim of access to educational opportunities or benefits provided by the school, a private action for damages under Title IX lies. *Davis*, 526 U.S. at 645.

To be liable under Title IX, the school must exclude persons from participation in, deny persons the benefits of, or subject persons to discrimination under its programs or activities. Yale's indifference to the denial of access is severe, pervasive and objectively offensive.   The deprivation occurred in a context subject to the school's control. *Davis*, 526 U.S. at 645.  The complaint states a valid claim for a private action for damages under Title IX.

### C.    Plaintiff Property Pleads Severe Penalty/Selective Enforcement Claims

A plaintiff can attack university proceedings on the ground of gender bias, asserting that "regardless of the student's guilt or innocence, the severity of the penalty or the decision to initiate the proceedings was affected by the student's gender. *Yusuf*, 35 F.3d at 715.  Paragraphs 82-100, 123, 126, 127 and 130-135 adequately set forth the specific facts supporting an inference that such bias infected the process.

1.    **Yale Denied Access To Education When it Barred John from Its**

**Property**

Yale may be found liable if it imposes a discriminatorily motivated unduly severe penalty

such as expulsion. *McDonnel Douglas Corp v. Green,* 411 U.S. 792, 802; 93 S. Ct. 1817; 36 L.

Ed. 2d 668 (1973).

The Complaint alleges liability under this body of law.  A tangible educational action

(similar to termination in the *McDonnel Douglas* context) occurred on January 15, 2012, when

Yale denied John complete access to educational benefits.  Yale imposed immediate and severe

discipline without investigating the claim.  Yale barred John from all Yale property, without

conducting any hearing or any proceeding whatsoever.  Yale appointed a "fact-finder" on

February 28, 2012– a month and a half after it committed the very action proscribed by Title IX.

Complaint ¶ 82. The effective expulsion, and continued deprivation of educational resources and

the limbo of the unresolved investigation, all previously referenced, prevented John from

continuing his education elsewhere.  The investigation lasted one year after John would have

graduated from Yale.  The two and half year investigation not only deprived John of educational

opportunities at Yale but from other educational opportunities elsewhere.

Yale defends by asserting that Plaintiff fails to state a claim under *Yusuf* 's severe penalty

prong because Plaintiff fails to allege circumstances suggesting a meaningful inconsistency in

punishment and particular circumstances suggesting that gender bias was the motivating factor

behind the inconsistency.  Mem.: 8-9.  Yale's argument ignores the fact that access to education

is the protected activity under Title IX, and it committed a tangible educational action with

respect to this protected activity on January 15, 2012, when it barred John from campus and all

Yale property. *See Burlington Industries,* 524 U.S. at 761(a tangible action is a decision causing significant change in benefits).

### 2.    The Denial of Access to Education Was Motivated by Gender.

Other circumstantial evidence of the gender bias motivating Yale's actions at the time of Yale's tangible action is stated in the Complaint.  Precedent files reveal that Yale did not expel some students for sexual misconduct; other students formally accused of sexual misconduct using force have been given no more than a four (4) semester suspension after an investigation and hearing.  Complaint ¶ 158.  The same month, Yale was castigated in the media, including the New York Times, for its handling of a sexual misconduct complaint filed against a former quarterback of the Yale football team.  Complaint ¶ 64.  The circumstances surrounding the news coverage regarding the former quarterback and its temporal proximity to the filing of the sexual allegation complaint against John suggests that Yale felt a need to demonstrate a tough anti-male approach to sexual misconduct allegations.  The unusually suggestive and very close temporal proximity of this event to Yale's immediate expulsion of Plaintiff without any legitimate basis creates an inference of causation.  *Clark County School Dist v. Breeden*, 532 U.S. 268, 273; 121 S. Ct. 1508; 149 L. Ed. 2d 509 (2001).  Temporal proximity may suffice for the "relative light burden" of establishing a prima facie case.  *Asmo v. Keane, Inc.* 471 F. 3d 588, 598. (6th Cir 2006); *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2nd Cir. 1980).

Yale argues that the required discriminatory nexus - "particular circumstances suggesting that gender bias was a motivating factor behind the inconsistency" in the punishment can only be made by "specific factual allegations that a school treated members of the opposite sex facing

comparable disciplinary charges differently."   Yale asserts that absent this connection, courts have dismissed claims of gender discrimination.  (Mem.: 8-9.)  Defendant is mistaken.

First, evidence of discriminatory state of mind is not limited to direct evidence; discrimination can be proven by circumstantial evidence.  Evidence of disparities in treatment between the female complainant and the male respondent may be circumstantial evidence of a hostile anti-male disciplinary environment.  Evidence of gender stereotyping and comments based on stereotypes, even by persons outside the decision-making chain, create an inference of bias and can play a motivating role in the decision.  *Back*, 365 F.3d at 120.

Second, there appears to be some confusion as to the nature and purpose of "comparative evidence" - evidence that similarly situated persons in similar circumstances were more favorably treated.  Pretext may be proven through comparative evidence.  *McDonnel Douglas Corp v. Green,* 411 U.S. 792, 804; 93 S. Ct. 1817; 36 L. Ed. 2d 668 (1973).   Thus, comparative evidence may be used to show the purported basis for the penalty (zero-tolerance) is pretextual because female students in similar circumstances are treated more favorably.   However, the suggestion in Yale's argument - that comparative evidence is the only means of proving discriminatory motive for the disparate treatment of males-is an irrational leap.  "In forbidding [decision makers] to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes."  *Los Angeles Dept of Water & Power v. Manhart,* 435 U.S. 702, 707 n. 13; 98 S. Ct. 1370; 55 L. Ed. 2d 657 (1978) *quoting Sprogis v. United Air Lines Inc,* 444 F.2d 1194, 1198 (7th Cir. 1971).

Third, there is no dispute that Title IX does not provide a private action for "disparate impact" of facially neutral disciplinary policies.  However, disregarding due process safeguards,

as Yale did, cannot be excused or explained under the umbrella of the "disparate impact" of a "zero tolerance" standard. A "zero tolerance" standard whereby male students are immediately barred from educational facilities upon the filing of a sex-based complaint by a female student is disparate treatment under Title IX.

It should be noted that the string of cases cited (Mem.: 19-23) do not involve similar circumstances to the present case. In all of them, including *Yusuf* [11] and *Columbia*, the disciplinary proceeding was concluded before the penalty was imposed. Here, the disciplinary hearing result was made to "justify" the punishment 2.5 years after the fact.

### D.    Plaintiff Properly Pleads A Title IX Erroneous Outcome Claim

Title IX is designed to protect from denial of access to an institution's educational opportunities and benefits. When the disciplinary proceedings are commenced after the denial of access, and maintained in complete indifference to the student's prolonged exclusion from all educational opportunities - the disciplinary outcome two years after the fact can only be seen as a pretext to justify the discriminatory conduct. Pretext may be shown by circumstantial evidence that casts doubt on the true reason for its action. *Cornwell v. Electra Central Credit Union* 439 F. 3d 1018, 1030-1031 (9th Cir 2006). Pretext may be found where shifting, contradictory, implausible, uninformed or baseless justifications for actions are given. *EEOC v. Ethan Allen Inc,* 44 F. 3d 116, 120 (2nd Cir 1994).

---

[11] In *Yusuf*, the sexual misconduct complaint was filed April 8, 1992 and disciplinary hearing held five days later – on April 13, 1992. Yusuf was disciplined by " i)banning him from Main Hall, ii) giving him a suspended suspension for the remainder of the Spring 1992 semester, and iii) suspending him from May 20, 1992 until Spring semester, 1993". *Yusuf*, 35 F. 3d at 712-713.

In this case, the procedural and evidentiary flaws amplify that the disciplinary outcome was a pretext to vindicate the discriminatory denial of educational opportunities. (Complaint ¶¶ 73, 77, 86, 87, 88, 89, 91, 92, 93, 94, 98 101-117, 123, 124, 127, 129, 132, 134, 146, 155.) Yale denied John the right to cross-examine Accuser at the hearing. Fundamental fairness requires an opportunity to confront and cross-examine adverse witnesses. *Goldberg v. Kelly* 397 U.S. 254, 269 (1970). Yale ignored the statement from the Native Dean who sent an email to UWC Chair Professor Della Roca reporting that the Accuser may not have been truthful in the investigation and indicating the tribal motivations and desire to control Yale's NACC and its funding by Accuser and the Navajo Group. The Native Dean also met with Dean Miller of Yale College and provided evidence of other instances of fabrication by the Accuser. Complaint ¶ 146. John's transcript from Yale indicates that he was expelled on February 2, 2012- two years prior to the UWC hearing and notice of the expulsion by Yale. Complaint ¶ 145.

As stated, the effective expulsion of John from campus, based on a sex-based complaint alone, is direct evidence of discriminatory animus. In addition, circumstantial evidence of temporal proximity – the published newspaper articles criticizing Yale for its mishandling of a sexual allegation complaint against a former male athlete, and thereafter recommending the athlete for the Rhodes scholarship, supplement evidence of the anti-male environment surrounding sexual misconduct allegations.

Yale asserts that the present case is "virtually identical" to the  circumstances in *Doe v. Columbia* and the claimed similarity dictates dismissal of Plaintiff's Title IX claim. The differences between these two cases is addressed above.

Neither can Yale find support in *Yusuf* for its prayer for dismissal. For an erroneous outcome case, the plaintiff must plead that the conduct was discriminatory and must allege

"particular facts sufficient to cast articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and must "also allege particular circumstances suggesting gender bias was a motivating factor behind the erroneous outcome. *Yusuf*, 35 F. 3d at 715. "[T]he pleading burden in this regard is not heavy. For example, a complaint may allege particular evidentiary weaknesses behind the finding of an offense…, or some other reason to doubt the veracity of the charge. A complaint may also allege particular flaws affecting the proof." *Id. Yusuf*'s language does not imply that the examples listed are the exclusive means of showing entitlement to relief under the erroneous outcome theory. A Title IX violation, based on an erroneous outcome theory, will lie where the proceedings themselves were invalid, and the erroneous outcome result from an invalid proceeding. *Wells v. Xavier University*, 7 F. Supp 3d 746, 751 (S.D. Ohio 2014).

Yale's argument that the Complaint itself suggests a non-discriminatory motive, i.e., that the University wished to demonstrate a new "zero tolerance standards on allegations of sexual misconduct," [Mem.: 8.] is flawed under the legal standard of construing pleaded facts in favor of the party opposing the motion. *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 673 (S.D.N.Y. 1996). If Yale acknowledges a mixed motive, Yale concedes the existence of an unlawful animus. The fallacy in the argument is that it fails to explain the lack of investigation and the total exclusion of the male student from school resulting from the mere filing of a sex-based complaint. No female student has ever been treated in such a manner. Allegations of sexual misconduct should be taken seriously. Sexual harassment by filing false charges should equally be taken seriously. A so-called "zero tolerance" policy wherein a male student is deprived of due process and subjected to an unfair disciplinary process years later to vindicate this due process violation, is discriminatory. Thus, the purported motivation is, in fact, pretext.

That argument was rejected by the *Wells* court.  In *Wells* the court found that a complaint alleging that a male student accused of assault due in part to his status as a male student, and the actions of the University done with the goal of demonstrating to the O[ffice of the] C[ivil] R[ights] that Xavier [University] was taking assault allegations seriously, states a Title IX claim under *Yusuf*'s erroneous outcome category.  *Wells v. Xavier University*, 7 F. Supp 3d at 751.

### E.     Title IX Requires A Fair And Equitable Disciplinary Hearing Process.

The Department of Education's Title IX regulations require all higher educational institutions to have sexual assault policies and procedures that "accord[] due process to both parties involved."[12]  While courts have held that students in private and public educational institutions are not entitled to the full panoply of due process rights accorded to criminal defendants in courts of law under the Fourteenth Amendment, it is clear that some measure of reasonable process is required in student disciplinary proceedings to ensure "a fair and equitable process" for both parties.  John alleges that Yale violated Title IX by failing to offer him rudimentary procedural safeguards, resulting in a fundamentally flawed disciplinary proceeding, while accommodating Accuser in every possible way.  Complaint ¶¶ 74-80, 87-100, 109-135, 144-151.

First, despite the threat of serious charges and severe sanctions, Yale's policies and procedures prohibit those accused of sexual misconduct from involving an attorney in the proceedings.  UWC Rule 5.

---

[12] 66 Fed. Reg. 5512 at 22.

Yale's policies and procedures prevent students accused of sexual assault from questioning their accuser at the hearing, and in John's case Yale placed John in a separate room during Accuser's statement and forced him to listen to her statement.  Complaint ¶ 133.  These measures prevented John from confronting his accuser at the hearing through cross examination and even from observing her during her testimony.  (*Id.*).  Although case law indicates that the "right to unlimited cross-examination" has not been deemed an essential requirement in school disciplinary cases, in at least two cases the schools permitted the accused to ask questions of his accuser.  *Bleiler v. College of the Holy Cross*, 2013 U.S. Dist. LEXIS 127775 *3 (D. Mass. Aug. 26, 2013) (both complainant and accused "were permitted to ask questions of ... each other"); *Mallory*, 76 Fed. Appx. at 637 (Mallory's student-representative was permitted to ask questions about the matters each witness discussed on direct).  Yale did not even accord that bare-minimum right to John.  Complaint ¶¶ 131-133.

John also alleges that under the circumstances the UWC Panel's application of the "preponderance of the evidence" standard violated simple fairness principles.  The evidence John provided – medical expert reports and psychological testing results – were deemed to be "of limited value" by the UWC Panel.  Complaint ¶¶ 122-124.  Instead, at the hearing, with no corroborating physical, medical or other evidence, and because Yale was under scrutiny from the media and Department of Education with respect to its handling of previous sexual misconduct proceedings, this low evidentiary standard unfairly skewed the proceedings and resulted in a pre-determined finding in favor of Accuser.  Yale effectively required John to bear the burden of proving innocence, rather than placing the burden on the accuser to prove guilt, while at the same time ignoring evidence of John's innocence.  Complaint ¶¶ 109-135.

Yale has chosen not to even defend its inadequate procedural safeguards, arguing only that the Complaint should be dismissed based solely on the holdings in *Iqbal*, *Twombly* and *Columbia*. As discussed above, those cases cannot bear the weight Defendant seeks to place on them to defeat John's claims.

Yale's procedures were so deficient as to defy explanation. The OCR's Revised Sexual Harassment Guidance issued in 2001, which the "Dear Colleague" Letter references, expressly states that "[p]rocedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions."[13] Yale's wholly inadequate safeguards simply do not, and in John's case did not, ensure "due process to both parties involved" or even a minimal level of fairness.

## VIII. Plaintiff Properly Pleads Title VI Violations

According to Title VI, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in any program receiving Federal financial assistance." 42 U.S.C. § 2000d.[14] Yale's pattern of discrimination against Plaintiff due to his race is evident (Complaint ¶¶ 75, 83, 131, 134, 155, 166), and the allegations demonstrate a good faith basis for the belief that this pattern of discrimination will be made even more clear in discovery. S*wierkiewicz v. Sorema N. A.*, 534 U.S. 506, 506-07, 122 S. Ct. 992, 994-95, 152 L. Ed. 2d 1 (2002); *Barrett v. Forest*

---

[13] See 2001 Guidance at 22, available on the Department's website at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf.

[14] By the nature of the law, the arguments for liability under Title VI and Title IX are similar, and the legal principals are interchangeable. As a result, some of the arguments are necessarily redundant as Plaintiff defends his complaint allegations on both bodies of law.

*Labs., Inc.*, 39 F. Supp. 3d 407, 432 (S.D.N.Y. 2014) (in most cases, plaintiffs will be unable to provide reliable statistics before they have access to discovery).

Plaintiff has alleged facts suggesting that Yale intentionally discriminated against Plaintiff because he is a Native American man. Plaintiff has also alleged facts showing that the implementation of Yale's policies have a disparate impact on minority men at Yale.

### A.    A Title VI Claim Is Stated Based On Yale's Indifference

The deliberate indifference standard for Title VI racial harassment claims is the deliberate indifference standard employed in Title IX. *Williams v. Port Huron Area School District* 455 F. App'x 612 (6th Cir. 2012); *Williams v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005). There is a private action for damages for discrimination on the basis of race or national origin in educational programs and activities. *Gebser*, 524 U.S. at 291. "[R]ecipients could be liable in damages only where their own deliberate indifference effectively 'caused' the discrimination." *Davis*, 526 U.S. at 645, citing *Gebser*, 524 U.S. at 291.

A school has notice of harassment if, "in the exercise of reasonable care it should have known, about the harassment." See OCR's *Sexual Harassment Guidance*. *See also* Dear Colleague Letter, October 26, 2010, fn 9. Yale received notice of the racially motivated harassment from the Native Dean prior to the Decision. However, two years prior, had Yale investigated the claim before excluding John from all educational opportunities the devious purpose of the allegation would have been discovered.

Yale's liability is premised on their failure to investigate any facts other than Accuser's allegation. The denial of educational access had no basis other than the filing of the false complaint. Yale's deliberate indifference caused the discrimination. *Davis*, 526 U.S. at 642-643. Whether Yale fully appreciated the racial motivations doesn't matter because these claims

do not require proof that "the defendant fully appreciated the harmful consequences of that discrimination, because deliberate indifference is not the same as action (or inaction) taken maliciously or sadistically for the very purpose of causing harm." *Williams v. Port Huron Area School District* 455 F. App'x 612, 619(6th Cir. 2012) *citing Gant v Wallingford Bd of Educ* 194 F 3d 132, 141 (2nd Cir 1998).

Yale could have learned about the racial motivations and remediate their decisions, but its actions showed deliberate indifference to the proffered information. The Accuser and the Navajo Group filed false claims against the Native Dean. Complaint ¶¶ 137, 141. This put Yale on notice that something more was going on among this group which should have raised suspicions, but that was never investigated. The Native Dean met with Dean Miller of Yale College, and sent an email to UWC Chair Della Roca to shed more light on the situation. Complaint ¶ 134, 146. Instead or investigating the Native Dean's information, Yale removed him from his position and, therefore, eliminated rather than investigated the evidence. By its failure to take appropriate action and even investigate the racial issues, Yale is deemed to have adopted the offending conduct and its results quite as if it had been specifically authorized. *Swenson v. Potter* 271 F. 3d 1184, 1191 (9th Cir 2001). A school is directly liable for its indifference where it had the authority to take remedial action. *Davis*, 526 U.S. at 644. Thus, The complaint states a valid claim for damages under Title IX and therefore under Title VI. *Davis*, 526 U.S. at 645.

### B.    A Title VI Claim Is Stated Based On Disparate Treatment

To state a claim under Title VI of the Civil Rights Act, a plaintiff must allege that he was treated differently from similarly situated students who are not members of a protected class. *Osei v. La Salle Univ.*, 493 Fed. Appx. 292, 2012 U.S. App. LEXIS 17463(3rd Cir. 2012). Plaintiff's burden of establishing a prima facie case has been described as "modest" or even

"minimal." It is a burden of production, not persuasion, and involves no credibility assessments. *Johnson v. County of Nassau,* 480 F Supp 2d 581, 594. (EDNY 2007). The Complaint meets the elements of a prima facie case of disparate treatment discrimination in violation of Title VI. *Sutera v. Schering Corp* 73 F 3d 13, 16 (2nd Cir 1995) (the showing the plaintiff must make as to the elements of a prima facie case in order to defeat a motion for summary judgment is *de minimis*) (*citing Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2nd Cir. 1995)).

Plaintiff identifies with the Lakota nation. Complaint ¶ 17. Discrimination claims based on tribal identity may be brought either as racial or national origin discrimination claims. *Dawasvendewa v. Salt River Project Agr. Imp & Power Dist*, 154 F.3d 1117, 1119, n. 4 (9th Cir 1998), *citing Weahkee v Perry* 190 U.S. App DC 359, 587 F. 2nd 1256 (DC Cir 1978) and *Perkins v. Lake County Dept of Utilities*, 860 F Supp 1262 (E.D. Ohio 1994).

### 1.    Discrimination Against Plaintiff Resulted In Less Favorable Treatment.

Plaintiff was entitled to a fair procedure including a fair investigation to protect the accused's right not to be disciplined without fair procedures. *Swenson v. Potter*, 271 F.3d 1184, 1188-1189. (9th Cir 2001). Yale did not conduct any investigation before barring Plaintiff from campus on January 15, 2012. Complaint ¶¶ 6, 8, 77. In fact, Yale has admitted that it expelled Plaintiff before conducting **any** investigation, hearing or other procedures to vet the accusations against him. Complaint ¶¶ 6, 8, 77.

Yale had never completely denied any other student access to educational facilities without an investigation of a sexual misconduct complaint. Complaint ¶ 78. Yale had never expelled any other student for sexual misconduct. Complaint ¶ 158. Other students formally accused of sexual misconduct using force have been given no more than four (4) semester

suspension. Complaint ¶ 158. A Yale student accused of attempted murder by strangulation was not barred from campus. Complaint ¶ 159.

### 2.    Race/National Origin/Tribal Affiliation Were Motivating Factors

To prove whether race was a motivating factor for any adverse decision, a plaintiff may construct circumstantial evidence that points directly to a discriminatory reason for action. A defendant's explanation that lacks credibility is one form of circumstantial evidence that is probative of intentional discrimination.   A plaintiff may rely on behavior that either acknowledges discriminatory intent or more ambiguously supports an inference of discrimination. In addition, a plaintiff may show that similarly situated persons were given more favorable treatment. *Burks v. Wis. DOT*, 368 F Supp 2d 914, 919-920 (W.D. Wis. 2005).

The totality of circumstances alleged suggest Plaintiff was singled out for harsh treatment because of his affiliation with the Lakota Tribe and/or an assumption by Yale that, as a Native American on financial aid, he would be unable to fight back against that treatment.  No other student had been expelled based on an allegation of sexual misconduct, with or without an investigation. Complaint ¶ 158. "Disparate treatment is demonstrated when '"the [decision maker] simply treats some people less favorably than others because of their race, color, religion [or other protected characteristics]. *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir 2004).

### IX.    Leave To Amend Is Warranted If This Court Grants any Aspect of The Motion

Notwithstanding the foregoing, should the Court determine that Plaintiff's Title IX or Title VI claims are not adequately plead, Plaintiff hereby seeks leave to amend the Complaint. Fed. R. Civ. P. 15(a); *City of Manchester v. Nat'l Gypsum Co.*, 637 F. Supp. 646, 648 (D.R.I.

1986) ("The second sentence of Fed.R.Civ.P. 15(a) encourages courts to look favorably on a party's request to amend: 'leave shall be freely given when justice requires.'")

Based on the foregoing, and given the greater nationwide implications of any finding in this case, the Court should exercise its discretion to grant Plaintiff leave to amend his Complaint. Finally, insofar as this action has been brought pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1332, the Court should retain Plaintiff's state law causes of action in the event that Plaintiff's Title IX claim is dismissed.

## X.   Conclusion

For all of the above reasons, Plaintiff respectfully requests that the Court deny defendant Yale's motion to dismiss Plaintiff's First and Second Causes of Action.  Plaintiff has alleged sufficient plausible facts to defeat defendant's motion.


DATED:  May 4, 2016


                    BY  /s/Frederick M. O'Brien/s/
                         Frederick M. O'Brien
                         Federal Bar No.ct08989
                         Pattis & Smith, LLC
                         383 Orange St.,1st Fl.
                         New Haven, CT 06511
                         203-393-3017
                         fobrien@pattisandsmith.com

## CERTIFICATION

This is to certify that on May 4, 2016 a copy of the foregoing was filed electronically. Notice of this filing will be sent, via email, to all parties by operation of the Court's electronic filing system, and the undersigned did cause to be sent, via First Class United States mail, postage pre-paid, a copy of the foregoing to all counsel of record and pro se parties that do not have access to the Court's electronic filing system and to whom the Courts direct the undersigned send a hard copy via the mail. Parties may access this filing through the Court's system.

/s/Frederick M. O'Brien/s/