UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE | : | CIVIL ACTION NO. |
| Plaintiff | : | 3:15-CV- 01608 (AVC) |
| v. | : | |
| YALE UNIVERSITY | : | |
| Defendants | : | MAY 25, 2016 |

**FIRST AMENDED COMPLAINT FOR LEGAL AND EQUITABLE RELIEF
(CORRECTED)**

Plaintiff John Doe, by and through his undersigned attorneys, files this Complaint against President and Fellows of Yale College and, in support thereof, alleges as follows:

1.      Plaintiff John Doe (hereinafter "Plaintiff" or "John") resides in California. During the events described herein, John was a student at Yale University.  John is proceeding under a fictitious name for his protection and because of the sensitive nature of the factual background of this action.  His true identity will be disclosed to the Court, confidentially, at the Court's request.  The nature of the allegations will inform the named defendant of John's true identity.

2.      Defendant Yale University (hereinafter "Yale" or "College") is a private, university with a principal address of Woodbridge Hall, 105 Wall Street, New Haven, Connecticut  06520.  Yale's roots can be traced back to the 1640s, when colonial clergymen led an effort to establish a college in New Haven to preserve the tradition of European liberal education in the New World.  In 1701, a charter was granted by the Colony of Connecticut for a school "wherein Youth may be instructed in the Arts and Sciences [and] through the blessing of Almighty God may be fitted for Publick employment both in Church and Civil State."  In 1718 the school was renamed "Yale College" in gratitude to Elihu Yale, who had donated funds and books to the college. (Website. http://www.yale.edu/about/history.html.)

3.     Yale is among the most elite of national universities in the United States.  In its 2015 rankings, U.S. News & World Report ranked Yale as the 3rd best national university in the nation (as it has for the past thirteen years) behind Princeton and Harvard, respectively. ("National     University     Rankings,"     U.S.     News     &     World     Report, http://colleges.usnews.rankingsandreviews.com/best-colleges/rankings/national-universities; "Yale University," Wikipedia. wikipedia.org/wiki/Yale_University#University_rankings).

4.     Yale recruits and accepts students and financial contributions from citizens and residents of the state of California, thus subjecting it to the jurisdiction of the courts in the state of California.

5.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants herein named as Does 1 through 100, inclusive, are unknown to John who, therefore, sues said defendants by such fictitious names. John will seek to amend this complaint to state the true names and capacities of these Doe Defendants when they have been ascertained.  At the time of the wrongful acts described in this complaint, the named defendants and Does 1 through 50, participated in some or all of the acts herein alleged, whether as a principal, agent, alter ego, employer, employee, successor or representative of some or all of the other defendants, acting within the course and scope of said agency and employment.

## NATURE OF THE ACTION

6.     This case arises out of actions taken by Defendant Yale University concerning false allegations of sexual misconduct made against John, a Native American and Filipino male student at Yale with a stellar and an otherwise unblemished academic and disciplinary record, by a fellow Native American Yale student who will be referred to as "Accuser."

7.     At all times material hereto, Yale acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of Yale's business, mission and/or affairs.

8.     On or about January 15, 2012, John was placed on an "administrative suspension" from Yale University, and barred from entering Yale property.   At the time of John's "administrative suspension" from Yale University, he had completed all of the course

requirements to be a second semester junior and was registered for a full course load for the spring of 2012. John's cumulative Grade Point Average was 3.4 at the time of his administrative suspension from Yale University. He had not been involved in any other disciplinary matters during his time at Yale.

9.      On July 25, 2012, during his period of administrative suspension, Yale sent a letter to John advising him that he was the recipient of an endowed scholarship based on "your past and present academic achievements and extracurricular activities, and also your promise as a member of the Yale community."

10.      John's partial education at Yale University has cost in excess of $100,000.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.      John's Decision To Attend Yale.

11.      Before his enrollment at Yale in August 2009, John was a highly accomplished high school student attending a Catholic High School in Burbank, California, where he maintained a 3.8 grade point average on a 4.0 scale in the prestigious medical focus program.

12.      John's performance on college admission examinations was no different, as he scored a 1510 (out of a possible 1600) equivalent on the reading and writing sections of the Scholastic Assessment Test, placing him in the top percent of test takers nationwide.

13.      John was also involved in numerous extracurricular activities, as well as volunteering at numerous public interest organizations focused on Native American activities.

14.      Armed with his academic record, activity participation, and exam scores, John was capable of enrolling in the nation's top universities and colleges and considered attending the University of California at Berkeley and New York University (where he was offered a full scholarship as part of the Martin Luther King, Jr., Scholars Program). John had visited New Haven many times growing up because his family had friends there, and the Yale Native American community was welcoming. Given Yale's reputation and his experiences and connections in the community, John selected Yale.

15.      John spent the remainder of his senior high school year preparing for his undergraduate education, and the move 3000 miles across the country from his home in

3

California, the first step in his goal to attend law school or graduate school at a top-flight university and further his life goal of helping his Native American community.

### B.     Significance of Tribal Affiliation and Control of Native Student Groups.

16.     John met Accuser and her friend Dinee Dorame ("Dorame") at an orientation program for Native American students in September of 2011.

17.     John identifies with the Lakota (Sioux) Nation.    Accuser, Dorame and Christopher Brown ("Brown"), another Yale student acquaintance of Accuser, all identify with the Navajo Nation.

18.     Deleted.

19.     Deleted.

20.     Deleted.

21.     In the Fall of 2011, John worked in the Native American Cultural Center ("NACC") in the work-study program as part of his financial aid package.  He also was elected Vice-President of the American Indian Science and Engineering Society ("AISES") and accompanied the Director of the Native American Cultural Center and Associate Dean of Native Students ("Dean of Native Students") on trips to California and South Dakota to recruit Native American students for Yale University.

22.     On information and belief, during the 2011-2012 school year, Dorame and Brown discussed how to "get rid" of John and the Dean of Native Students in order to "take over" the NACC at Yale to further the interests of the Navajo group at Yale.

23.     The Dean of Native Students, like John, identifies with the Lakota (Sioux) Nation.

24.     Control of the Yale NACC would be beneficial to students such as Accuser and her acquaintances for multiple reasons.  Native American students at Ivy League schools typically have access to national leaders of the Native American community, gain elevated status back home on their reservations and throughout their Nations as a whole, and enjoy improved employment opportunities.  The NACC serves as an important recruiting center for prospective Native American students.  Having the NACC "controlled" by members of a particular Nation would unquestionably benefit that Nation while hurting the others.  Control of the NACC allows control of event funding from the NACC budget.  For example, prior to Dorame and Brown and

4

their confederates taking control of the NACC, the Native senior dinner was held on campus at a cost of approximately $3,000. In 2015, under Dorame and Brown's control, a chartered bus has been rented and the senior dinner is being held off campus at triple the cost.

25.     On information and belief, Dorame and Brown discussed with other Native students their dislike of the Dean of Native Students, how John was a supporter of the Dean of Native Students and how the Dean of Native Students should be replaced.

26.     On information and belief, the goal of Dorame and Brown to take over the NACC led to Dorame's involvement in convincing Accuser to make untrue sexual misconduct allegations against John in January 2012.

27.     On information and belief, there are currently approximately 10 to 15 active members of the NACC, at least 5 of which identify as Navajo. When John worked at the NACC, there were 20 to 30 active members. The Navajo contingent, led by Dorame and Brown, has driven approximately 50% of the Native students out of the NACC and has caused other Native American students to leave Yale entirely.

**C.     Accuser Conspires With Others to Falsely Accuse John.**

28.     On or about October 20, 2011, Accuser asked John if he was interested in receiving oral sex from her in the library of the NACC at Yale University. John accepted Accuser's offer.

29.     John again saw Accuser on several occasions soon after the October 20, 2011 encounter, but did not engage in sexual activities, although Accuser suggested that she and John "get together" again.

30.     On information and belief, in November, 2011, Dorame and Accuser conspired to arrange a situation where Accuser could approach John to persuade John to engage in sexual activities with her.

31.     On information and belief, on or about November 20, 2011, Accuser and Dorame went to the NACC together. While Dorame waited in the hallway, Accuser approached John while he was studying in the NACC library, embraced him from behind and asked him if he was interested in having sex with her. John told Accuser that he was studying for a test the following

day and did not want to be disturbed. Accuser then called John an "asshole" and left the NACC with Dorame.

32.     On information and belief, Accuser told Dorame and other individuals that John would be visiting her at her home during the 2011-2012 Winter Break when in fact John had never told Accuser he would visit her at home as he did not have the funds to make such a trip.

33.     On information and belief, during Winter Break, after John did not visit Accuser at her home, Accuser contacted Dorame and they discussed how to "get even" with John when school began in January 2012.

34.     On information and belief, Dorame and Brown also discussed during Winter Break how to "get rid" of John in order to take over the NACC.

35.     On information and belief, Dorame persuaded Accuser to arrange a situation where John would be accused of sexual misconduct.

### D.     Any and All Sexual Conduct at Issue was Consensual.

36.     On January 13, 2012, Accuser went to a party at a fraternity house where John was a member.

37.     Prior to going to the party Accuser texted Dorame stating that she did not know "if this is such a good idea."

38.     On information and belief, Accuser asked several people if they knew where John was, and they directed her to the basement dance floor and bar where John was bar tending.

39.     Accuser asked John to dance with her.  John told Accuser that he was working and could not leave his job at that time.

40.     Accuser remained near the bar with John until he was finished with his bar tending duties; then Accuser and John danced and began kissing on the dance floor.  Neither party was intoxicated.

41.     Accuser asked John if he wanted to have sex with her by asking him to "take her upstairs," and John agreed to have sex with Accuser and they went to an upstairs bedroom at the fraternity house.

42.     Accuser and John began kissing and Accuser removed her clothes.

43.     John said that he did not have any condoms and Accuser suggested John ask the person whose room they were in if he had any condoms. Once condoms were obtained, Accuser and John then engaged in consensual sexual intercourse at the fraternity house.

44.     After engaging in sexual intercourse for some time, Accuser and John were interrupted by a text from the person whose room they were occupying requesting that they leave his room. Accuser then requested that John take her to his dorm room in the Swing Space dorm. They dressed and stayed at the party for approximately 15-20 minutes after leaving the bedroom in the fraternity house. They then walked to John's dorm room for the agreed upon purpose of resuming their sexual encounter.

45.     After arriving at John's dorm room they helped each other remove their clothes. John then attempted to engage in sexual intercourse with Accuser, but John was unable to maintain his erection. As a result, Accuser gave John oral sex until John became erect and they then engaged in sexual intercourse.

46.     On one or two occasions, Accuser told John that she wanted to take a break and John immediately stopped all sexual activity until Accuser clearly indicated that she wanted to continue having intercourse. She gave John oral sex until he achieved an erection, then they put a condom on John's penis and engaged in intercourse.

47.     At all times during intercourse Accuser appeared to John to be sexually aroused.

48.     At no time did Accuser ever revoke her consent to sexual activity, or otherwise indicate to John that she wished to cease sexual activity except to "take a break." She initiated sexual activity following the break.

49.     John told Accuser that he had given her several suction marks (hickeys), and she stated that she did not mind.

50.     At no time did John attempt to engage in or engage in anal intercourse with Accuser.

51.     At approximately 4:15 a.m., Accuser stated that she wanted to return to her own dorm room. John told Accuser she could stay, because it was very early in the morning, her building was several blocks away, and it was cold outside.

7

52.     John helped Accuser gather her clothes, and knelt down to help her put on her shoes. Accuser told John she was not a child and could put her own shoes on.

53.     After Accuser got partially dressed she approached John while he was in the kitchen of the dorm room, grabbed John around the shoulders and hoisted herself up so her legs were around his waist. She then asked John if he wanted her to give him oral sex before she left. John accepted Accuser's offer, and she then gave John oral sex until John ejaculated. She then spit out the semen into the trash can.

54.     Accuser then finished getting dressed. John asked her again if she wanted to stay, but she declined. John then asked her to call his cell phone because John could not find it, which she did, and John retrieved the cell phone from the bed.

55.     Accuser then left John's dorm room. Up until that point, every sexual activity had been mutually consensual, and Accuser was either the aggressor or actively assisted John in having intercourse on each occasion. Accuser left when she wanted - not before or after. When she left, Accuser was dressed, in a good mood, and apparently pleased with the events of the evening.

56.     In the afternoon on January 14, 2012, John deleted Accuser from his Facebook friends' list because John was concerned she would talk about their "hooking up" the prior night. Although they had no monogamous agreement, John did not want another woman John had been dating in New York City to know that John had sexual relations with Accuser.

57.     On information and belief, on or about January 14, 2012, Dorame and Brown discussed convincing Accuser to file a complaint against John for sexual misconduct in order to remove him as an impediment to taking over the NACC at Yale.

58.     On information and belief, Accuser knew of their intention when she asked John to have sexual intercourse with her on the night of January 13-14th.

59.     On information and belief, on January 14, 2012, Accuser and at least one of her roommates took a train into New York City for a day of shopping, returning that evening.

60.     Dorame told Accuser that if she did not make the false allegations against John, Dorame would do it herself.

61.     At approximately 5:00 a.m., on the morning of January 15, 2012, Accuser and Dorame went to the emergency room at Yale New Haven Medical Center and first made the false claim that John had sexually assaulted Accuser in the early morning hours of January 14, 2012

62.     On information and belief, John alleges that Accuser was reluctant to make the false accusation, but Dorame pressured her into it by threatening to make the accusation on Accuser's behalf if Accuser refused to do so.

63.     On or about January 15, 2012, Accuser made a formal sexual assault charge against John with Yale University.

### E.     Yale's Handling of Sexual Assault Cases Receives Public Scrutiny

64.     During the month preceding the filing of the sexual assault complaint against John, several articles were published in newspapers, including the New York Times, castigating Yale University for recommending a former quarterback of the Yale football team for a prestigious Rhodes Scholarship after he had been the subject of a sexual assault complaint.

65.     On information and belief, Accuser was told by Dorame that she would be "in trouble" if she withdrew the complaint against John.  On information and belief, Accuser was also pressured by a senior member of the Yale administration not to withdraw the complaint against John.

### F.     Yale's Policies and Procedures Governing Disciplinary Proceedings.

66.     The "University Wide Committee on Sexual Misconduct" is Yale's disciplinary body for students and faculty accused of sexual misconduct.  The UWC broadly states its purpose as: "The University-Wide Committee on Sexual Misconduct ("UWC") provides an accessible, representative, and trained body to answer informal inquiries and fairly and expeditiously address formal and informal complaints of sexual misconduct."

67.     The UWC procedures on formal complaints, Section 7.3, paragraph 1 state:

> Within seven days of receiving the complaint, the chair will appoint an impartial fact-finder from outside the University to assist in the investigation of the case. The secretary will provide the fact-finder with the complaint, the response, and any other information provided by the parties. The fact-finder

will gather documents and conduct interviews as necessary to reach a thorough understanding of the facts and circumstances surrounding the allegations of the complaint. [17] The fact-finder will not consider information that is provided solely to attest to a party's character.

68.     The UWC procedures on formal complaints, Section 7.3, paragraph 2 states:

Within 21 days of his or her appointment, the fact-finder will present a written report to the secretary. The report will describe the relevant facts and circumstances and may address the credibility of witnesses but will not reach conclusions as to whether those facts and circumstances constitute a violation of University policy. After reviewing the report, the chair may request clarifications and additional investigation. The secretary will send a copy of the completed report to the parties and inform them of with the date and location of the hearing.

69.     The UWC procedures on formal complaints, Section 7.3, paragraph 3 states:

The complaint and response, all documents relating to the complaint and response (whether provided by the parties or obtained by the fact-finder), and the fact-finder's report will be provided to the hearing panel. The hearing panel will not accept from the parties any written response to the fact-finder's report or any additional documents, except as explained in Section 7.4 below. If a party believes the panel should interview witnesses, he or she must submit to the secretary the names of the witnesses and the subject of their testimony at least four days before the hearing. Normally, the panel will call a witness only if he or she can offer potentially relevant information that was not conveyed to the fact-finder. Witnesses may not appear for the sole purpose of testifying about a party's character.

70.     The UWC procedures on formal complaints, Section 7.4, paragraph 1 state:

The hearing will take place no sooner than five days after the parties' receipt of the fact-finder's final report. Unless both parties ask to appear jointly, the complainant and the respondent will not appear jointly before the panel at any stage of the hearing. The party who is not before the committee will be in a private room with audio access to the proceedings.

71.     The UWC procedures on formal complaints, Section 7.4, paragraph 2 states:

The hearing is intended primarily to allow the panel to interview the parties with respect to the fact-finder's report. The panel chair will begin the hearing by explaining the substance of the complaint and the specific University policy or policies allegedly violated. The complainant and then the respondent may make a brief statement of no longer than 10 minutes to the panel, and they may provide a written copy of their statements to the panel at the hearing. The panel will provide a copy of any written statement

10

it receives to the other party. Following these statements, the panel will interview the complainant and then the respondent. At its sole discretion, the panel may request the testimony of additional witnesses. [18] Witnesses, including the parties, will be questioned by the panel only, but each party will be given an opportunity to submit questions, which the panel, at its sole discretion, may choose to ask.

72.    The UWC procedures on formal complaints, Section 7.4, paragraph 3 states:

The panel may examine and take into account reports and evidence collected by law enforcement bodies or other investigators. In determining culpability, the panel may also take into account a respondent's previous formal discipline for other acts of sexual misconduct, including written reprimands, and the respondent's criminal conviction arising out of the events complained of. The panel may not take into account as evidence of culpability previous accusations of other acts of sexual misconduct that did not result in formal discipline or the fact that a criminal investigation or prosecution is pending in relation to the events complained of.

73.    The UWC procedures on formal complaints, Section 7.8 states in full:

For ease of reference, the following is a list of time periods that apply to the review of a formal complaint:
- The secretary must receive a response, if any, to the complaint within five days after the complaint is delivered to the respondent.
- The secretary must receive the parties' objections, if any, to panel members within two days after the parties' receipt of the members' names.
- The chair must appoint a fact-finder within seven days after receiving the complaint. The secretary must receive the fact-finder's final report within 21 days after the fact-finder's appointment.
- The hearing may begin no sooner than five days after the parties' receipt of the fact-finder's report.
- The secretary must receive a list of each party's witnesses, if any, at least four days before the hearing.
- The panel must submit its report within ten days after the final hearing session.
- The parties must submit a response, if any, to the report within three days after receiving it.
- The provost, dean, or associate vice president must render a written decision within seven days after receiving the panel's report.
- The president, provost, or vice president must receive an appeal, if any, within five days after the initial decision.

- The president, provost, or vice president must receive a response, if any, to an appeal within five days after the opposing party's receipt of the appeal.
- The president, provost, or vice president must render a written decision on the appeal within 14 days after receiving it.

Normally, the formal complaint process should take about 60 days. In instances where a time period set out in Section 7 cannot be met because of illness, holidays, the absence of witnesses from campus, the complexity of the case, or competing demands on UWC members or decision makers, the chair may extend that time period. The parties will be informed by the secretary or chair if a time period is extended, and the chair's decision regarding extensions will be final.

[See UWC Procedures can be found at: http://provost.yale.edu/uwc/procedures.]

## G.    John Was Unjustly Treated By Yale Representatives

74.     The Yale University Police Department was notified of Accuser's false claim, and officers were dispatched to John's fraternity house and dormitory room.

75.     At approximately 10:00 a.m., on January 15, 2014, four Yale University Police Department (YUPD) officers entered John's dormitory residence with weapons drawn. John, hearing noise in the common room of his residence, emerged from his bedroom to find four officers who pointed their weapons at John, placed him face down on the floor, and placed him in handcuffs. The YUPD officers then proceeded to search John's dorm room. At that time John was told that his room was considered a crime scene.

76.     The YUPD's actions were based in part on John's Native American and Filipino ancestry.

77.     On or about January 15, 2012, with no hearing, or other process whatsoever, John was barred by Yale from Yale University property, effectively preventing John from attending classes or otherwise continuing his education, and was placed on "administrative suspension." On information and belief, John was the first student accused of violating Yale's sexual misconduct policy to have been immediately barred from all Yale property, effectively expelling John from Yale University.

12

78. On information and belief, John was the first student accused of any crime to have been effectively expelled from Yale University with the speed and in the manner of John's expulsion.

79. On or about February 2, 2012, John went to YUPD headquarters where he was formally arrested by the YUPD and charged with first degree felony sexual assault, first degree felony unlawful restraint, and third degree felony unlawful restraint, based solely on Accuser's claims. John was immediately released on bail.

80. John was effectively expelled from Yale University, based in part on his Native American and Filipino ancestry.

81. On or about February 5, 2012, John relocated to Boston, Massachusetts because John was unable to attend classes, or otherwise be on Yale University property, and was emotionally distraught being in New Haven due to the false allegations and callous and unfair treatment at the hands of Yale University. On or about February 20, 2012, John began living and working at a coffee shop near Harvard University.

82. On or about February 28, 2012, Beverly Hodgson was appointed as the "fact-finder" by the University Wide Committee (UWC) on Sexual Misconduct at Yale University. On information and belief, Beverly Hodgson received no training to investigate sexual assault claims, or any training whatsoever prior being appointed as a fact-finder. Rather, Beverly Hodgson was formerly a Connecticut Superior Court Judge with no training in conducting investigations.

83. On information and belief, Beverly Hodgson had no cultural sensitivity training or any other training whatsoever regarding Native American cultural communication norms or other aspects of Native American culture, including Native American politics. In addition, on information and belief, Ms. Hodgson did not have knowledge of intertribal relations and conflicts and did not even understand the differences between particular Native American Nations. As a result, Ms. Hodgson was unjustly critical of John's demeanor at both interviews conducted because of her lack of knowledge of Native American communicative norms.

84. On information and belief, the members of the UWC received only minimal training on analyzing claims of sexual assault, and only minimal training in relation to Native

American affairs. On information and belief, no member of the UWC received cultural sensitivity training or any other training whatsoever regarding Native American cultural communication norms or other aspects of Native American culture, including Native American intertribal politics.

85. On information and belief, Dean Miller of Yale College never received cultural sensitivity training or any other training whatsoever regarding Native American cultural communication norms or other aspects of Native American Culture including Native American affairs, including without limitation intertribal politics.

86. Despite the pending criminal charges (later dismissed) John agreed to be interviewed by the fact-finder. Accuser refused to be interviewed by the fact-finder. Dorame refused to be interviewed by the fact-finder.

87. The UWC rules require a complainant must be interviewed by the fact-finder. However, Accuser was allowed to substitute her attorney and the police reports in lieu of an interview with the fact-finder for over two years. In April 2014, Accuser met with the fact-finder but was again allowed to substitute police reports in lieu of an actual interview, and never answered any questions.

88. Accuser gave her consent to the State's Attorney to provide the fact-finder with selective items of evidence: the Police arrest application and affidavit. The fact-finder was allowed to view photographs taken January 17, 2012. Accuser refused to allow the release of exculpatory items of evidence such as medical records and Accuser's own statements.

89. On information and belief, during the month of March 2012 the "impartial" fact-finder met and/or spoke with the State's Attorney on at least two occasions, sharing information and assisting each other with the prosecution of the respective cases against John in violation of his civil rights, fundamental due process rights, and contractual arrangements with Yale University.

90. The fact-finder worked together with the State's Attorney to review evidence, and the fact-finder revealed to the State's Attorney confidential information regarding the Yale complaint against John in violation of Yale's internal rules regarding such complaints.

14

91.   The State's Attorney, without John's consent, revealed confidential investigatory information to the fact-finder and withheld other information in order to target John, based solely on Accuser's claims and in part because of his Native American and Filipino ancestry.

92.   The fact-finder became effectively, an arm of the State's Attorney and the State's attorney became, effectively, an arm of Yale University, to John's detriment and they conspired together to violate his civil rights and fundamental due process rights.

93.   None of Accuser's witnesses agreed to be interviewed by the fact-finder in 2012.

94.   On information and belief, although Accuser was not a defendant in any criminal proceeding, Yale University assisted her by arranging an attorney for her. UWC Chair Michael Della Rocca instructed the fact-finder not to contact Accuser directly.

95.   The fact-finder talked to two of John's witnesses on the telephone, and one in person, although all seven of John's witnesses had made themselves available to meet with the fact-finder in person.

96.   On or about March 29, 2012, the fact-finder submitted her report. In that report she stated that: "Lack of access to medical records and inability to interview [Accuser] have prevented me from exploring any inconsistencies or exaggerations or errors in the police officer's report of what [Accuser] told her.  The absence of discernible scratches in the photographs taken of [John] undermine her reported account of scratching him in the course of trying to push him away. The reference in the report to anal sex and forcible vaginal penetration cannot be forensically confirmed without access to the medical examination report."

97.   UWC rules require the Complainant to be interviewed by the fact-finder, but Accuser did not talk to the fact-finder at all until April of 2014.

98.   At that point, the UWC had deprived John of two years of schooling, had obviously reached its conclusions about the final disposition of his case, had obviously formed an intention to disregard exculpatory evidence, and was obviously seeking to justify its previous conduct.

99.   The interview with Accuser, substantially after the time it should have been conducted, appears to have been conducted to feign compliance with investigative procedural requirements. Even at that "interview" Accuser did not speak; she was merely asked to validate

15

the police investigation summary. The only document that contains statements by Accuser, the 45-page "Statement of Complainant", is not part of the Supplemental Report and was not reviewed by the fact-finder.

100. The supplemental report indicates that the Yale General Counsel's Office obtained police reports from the State's Attorney and provided those reports to the fact-finder. It appears that the 45-page Statement of Complainant, was never provided to the fact-finder and, if provided, the fact-finder did not read, or worse, chose to ignore its contents.

101. On or about June 30, 2012, John relocated from Boston to the Pine Ridge Indian Reservation in South Dakota to live with relatives and work with an attorney and the American Civil Liberties Union in bringing an action against the State of South Dakota for violations of the Indian Child Welfare Act. The attorney for whom John worked sent a letter of support to the fact-finder, on or about April 25, 2014.

102. The attorney for whom John worked advised the fact-finder that John had volunteered his time interviewing indigent Native Women whose children had been unlawfully removed from their homes by the State of South Dakota.

103. On or about December 20, 2012, John returned to Los Angeles, California. On or about January 20, 2013, John began working for an entertainment tax firm in Los Angeles.

104. On or About August 7, 2013, John relocated to Hilo, Hawaii to attend the University of Hawaii. John attended the University of Hawaii for two semesters, doing independent research his second semester. John maintained a 4.0 GPA at the University of Hawaii.

105. John was required to be in New Haven for court appearances and meetings during 2012 and 2013 on several occasions. He stayed at the Sigma Chi fraternity. On several occasions he was forced to leave the Sigma Chi fraternity house because Dorame and Accuser would attend parties at the house.

106. On information and belief, in the Fall of 2013, Accuser began dating another Yale student who was considering joining the Sigma Chi fraternity, and she attended several parties at the fraternity with him.

16

107.    On or about September 1, 2013, a forensic examiner, Dr. Lee, determined that the photographs of Accuser reviewed by the fact-finder had been enhanced to make suction marks on her shoulders and breast appear more severe.

108.    During the Fall of 2013 medical expert reports analyzing the medical records referenced in the fact-finder's report were provided to the Connecticut State's Attorney for John's criminal case.  Shortly thereafter the State's Attorney offered to dismiss all charges if John would plead *nolo contenderé* to the lowest level of misdemeanor and be given a two-year conditional discharge with no other restrictions, and no sexual elements.

109.    The medical experts had access to the entire file in this matter, including all medical records, the police reports, and importantly, Accuser's 45-page statement.

110.    When he prepared his forensic odontology report Dr. Golden was the President of the American Forensic Odontology Association and primarily a prosecution expert for District Attorneys in California.  His opinions, which vindicated John, were ignored by the UWC.

111.    The medical expert reports stated that there was no evidence of forcible vaginal or anal intercourse. There was no evidence of injuries to the mouth or throat. There were no injuries to the hair or scalp from the hair being pulled.

112.    The medical expert reports stated that if John had held Accuser in the manner alleged by Accuser, there would be both posterior and anterior marks, which were not present.

113.    The medical expert evidence flatly disproved Accuser's accusations, but the UWC refused to even consider this critical evidence when making a decision that has adverse implications for the rest of John's life.

114.    Sexual Assault Nurse Judy Malmgren, who had access to the entire file in this matter, including all medical records, the police reports, and importantly, Accuser's 45-page statement and who has examined hundreds of women who had actually been sexually assaulted, did not believe that Accuser had been sexually assaulted, and pointed out numerous inconsistencies in Accuser's statements, and discussed how the medical evidence did not support Accuser's claims.  The UWC refused to even consider this critical evidence when making a decision that has adverse implications for the rest of John's life.

17

115.    After being advised of Yale University's expulsion of John based on Accuser's claims, Nurse Malmgren wrote: "Sounds like they are just not interested in finding out the facts."

116.    John also submitted to an anger management evaluation.    The evaluator, Dr. James Walton, found that John had no anger management issues.

117.    John also submitted to a Sex Offender Evaluation.    The evaluator, Dr. Amy Phenix, found that there was virtually no chance that John had ever, or would in the future commit a sexual offense.

118.    Because of the financial burden on his family, his desire to move forward with the Yale process and put the criminal process behind him, and repeated assurances from his Residential College Dean, Mia Genoni, that John would eventually be allowed to return to Yale to finish his education, John agreed to accept the plea arrangement offered by the State's Attorney.

119.    On or about January 23, 2014, all charges against John were dismissed despite the vocal objections of Accuser's representative, and John pled *nolo contenderé* to the 2nd degree misdemeanor of unlawful restraint (the lowest level of misdemeanor in Connecticut), and was given a two year conditional discharge with no other restrictions.    There is a near certainty that this record will be expunged, leaving John with no criminal consequences from the allegations.

120.    On or about January 25, 2014, John was informed that his leave from Yale, after being barred from all Yale property two weeks after Accuser's complaint was filed in 2012, was considered to be "voluntary" by Yale.

121.    On or about April 3, 2014, John was contacted by Beverly Hodgson, the Yale "fact-finder" who requested a second meeting with him because she was interviewing individuals who had refused to speak to her two years previously, at the time of the incident, and wanted John's response to their comments.

122.    The medical and psychological experts who investigated the claims against John produced reports that explained why the accusations were and had to be false. John sent the reports to the fact-finder and asked her to consider these reports.

123.    John also asked the fact-finder if she wanted to question the experts. She declined to question the experts. Unfortunately, the fact-finder's refusal to investigate made it convenient

18

for the UWC to disregard the expert reports, stating in their panel report: "Although the panel reviewed the experts' reports provided by the fact-finder, the panel considered that these reports were prepared by experts selected by [John] (the panel acknowledges that in at least one instance, the expert was approved by the prosecutor in [John's] criminal case) and did not allow for cross examination of the experts in order to better understand the context for which the reports were prepared or for the conclusions that were drawn. For these reasons the panel found these reports of limited value in making its findings, conclusions and recommendations in this matter."

124.    The UWC's remarks in this context are particularly offensive because the experts were made available for cross-examination.

125.    On or about April 24, 2014, John was interviewed by the fact-finder a second time. At both interviews the fact-finder advised  John that her job was not to draw conclusions or make recommendations, but to only report the facts.

126.    At no time was John asked to sign a notice of his rights and at no time was John provided a notice of his rights, as required by federal law (Family Educational Rights and privacy Act, known as FERPA).

127.    At no point was Accuser ever required to answer questions about her complaint against John. Two (2) years and three (3) months after the event, when she was called to answer questions, she was allowed to leave the fact-finder's interview after only a few minutes without answering any questions. As the fact-finder stated "When I began to ask questions about what had happened in John's room, she began to weep and was unable to continue. She left the room with her advisor. When she returned, she was again teary and unable to talk about the events." In other words, Accuser never actually stated what had happened and the fact-finder relied solely on prosecutorial documents, which are created for the sole reason of making a defendant in a criminal matter appear guilty even when other exculpatory evidence exists. Importantly, the fact-finder never appeared to request and did not review Accuser's 45-page Statement, which taken together with the medical records, disproved Accuser's allegations.

128.    Accuser's Facebook page and entries for the last two years, as well as her attendance at fraternity parties and other events, indicate that she is not distraught, or otherwise

19

adversely affected in any way by the alleged events, suggesting that the emotional outbreak was feigned.

129.     The fact-finder submitted a supplemental report on or about April 29, 2014.

130.     On or about May 12, 2014, John appeared, gave a statement, and answered questions from the UWC panel. John was accompanied by his Residential College Dean and Faculty Advisor, Mia Genoni. Dean Genoni had assured John on several occasions that John would undoubtedly be readmitted to Yale University at some point in the future.

131.     In their questions and characterization of testimony during the hearing, and in their recommendation to Dean Miller, hearing panel members mischaracterized and inaccurately stated the testimony that had been presented and the evidence that had been supplied.

132.     Accuser was the only witness to appear on her behalf at the hearing. She was not accompanied by an advisor. She refused to answer any questions. John was told before the hearing that Accuser would not answer any questions and so there was no reason for John to submit any questions for the UWC to consider asking her.

133.     During Accuser's statement John was made to sit in a separate room and listen to the statement. Accuser did not provide copies of her statement to John or the UWC prior to the hearing. Thus, John had no viable opportunity to rebut Accuser's statement.

134.     On information and belief, on or about May 13, 2014, the Dean of Native Students sent an e-mail to Professor Della Roca, Chairman of the UWC, to the effect that he believed Accuser may have not been truthful with the UWC, and that John was not guilty of sexually assaulting Accuser or violating Yale's sexual misconduct policy.

135.     On May 20, 2014 the UWC panel made its recommendation to Dean Mary Miller of Yale University that John should be expelled from Yale University based on Accuser's complaint of sexual misconduct.

**H.     Continuation of Attempt to Assume Control of NACC**

136.     On information and belief, during the Fall of 2012 and Spring and Fall of 2013 and on or about December 10, 2013, Accuser, Dorame, Brown and their confederates discussed ways to have the Dean of Native Students removed from his positions at Yale.

20

137.    During that time, numerous complaints were made to various members of the Yale administration regarding the Dean of Native Students.

138.    On information and belief, on or about December 1, 2013, Accuser was informed that all charges against John were to be dismissed by the State's Attorney.

139.    On information and belief, on or about December 1, 2013, Accuser advised Dorame and her confederates that all charges against John were to be dismissed by the State's Attorney.

140.    On information and belief, on or about December 10, 2013, Accuser, Dorame, and her confederates discussed ways to prevent the charges being dropped against John.

141.    On information and belief, on or about January 15, 2014, either all or some of Dorame, Accuser and her confederates filed a claim against the Dean of Native Students alleging violations of Yale policy and procedures.  These allegations were found by Yale to be without merit, but on or about January 22, 2014, Dorame posted on her Facebook page: "the Revolution has begun," which referred to taking over the Native American Cultural Center and removing the Dean of Native Students from his position as NACC Director.

142.    On information and belief, on or about March 1, 2014 Dorame, Accuser and a confederate filed a claim against the Dean of Native Students alleging violations of Title IX of the Education Amendments of 1972.  Those allegations were found by Yale to be false and without merit.

143.    On information and belief, on or about June 11, 2014, the Dean of Native Students was removed from his positions at Yale and was told that he was removed because Dorame, Accuser, Brown and their confederates had requested his removal based on his support for John.

144.    Thereafter, the Yale Provost denied John's appeal.

145.    John's transcript from Yale indicates that he was expelled on February 2. 2012, well before the completion of any investigation, which fact corroborates the conclusion that the investigation was a sham and the results preordained.

**I.      John's Appeal of his Expulsion**

146.    On information and belief, the Dean of Native Students, prior to his removal from Yale, met with Dean Miller and informed her that Accuser had fabricated other stories and had very likely fabricated her claim against John.

147.    John provided a statement to Dean Miller setting forth inconsistencies in the UWC panel, fact-finder reports and other information before the UWC panel, but on or about May 27, 2014, Dean Miller adopted the UWC panel recommendation formally expelling John from Yale University.

148.    On or about June 4, 2014, John received an e-mail from Provost Polack's office advising John that his time to appeal had run, and therefore Dean Miller's decision was final.  On that same day John e-mailed Provost Polack that John wished to appeal the decision on procedural grounds.

149.    On or about June 6, 2014, Provost Polack advised John that his appeal would be accepted.  Immediately thereafter, John requested permission to submit additional materials to the Provost for his consideration.  On or about June 10, 2014, Provost Polack agreed to allow John until June 17, 2014, to submit additional materials.

150.    On or about June 4, 2014, or her Facebook page Accuser stated "I bruise like a peach."  That information was conveyed to Provost Polack.

151.    In her supplemental report filed with the UWC two years and three months after the complaint was filed against John the fact-finder asserted there was no evidence that Accuser bruised easily.  Accuser had never answered any questions posed by the fact-finder or anyone else connected with the UWC process.

**J.      Yale's Mistreatment of Native American Men**

152.    Yale University has a pattern and practice of treating Native American men differently than other men at Yale University are treated.

153.    Yale's mistreatment of John's case has empowered oppression on campus.  On information and belief, in the last two years over 20% of Native American men at Yale University have left school due in part because of harassment from Accuser, Dorame, and their confederates.

154. On information and belief, at least 1 Native American man left Yale after being told by Accuser and/or Dorame that they could "get him" if they wanted to.

155. The UWC and the fact-finder relied on the criminal investigatory materials in violation of the UWC rules and Yale policy (UWC Para. 7.4). The fact-finder then attempted to hide and mischaracterize that reliance by having Accuser and Dorame read their police statements and then assert they were true. In fact, the fact-finder went so far as to attach portions of Accuser's police statement to her report. That demonstrates total reliance on the criminal proceedings, even though all sexually related charges were dismissed in John's favor.

156. The fact-finder and Yale relied on the criminal proceedings to John's detriment in January and February of 2012, and through the entire process, barring John from Yale property and preventing John from continuing his education by that reliance in clear violation of his due process rights and Yale policy.

157. On information and belief, no non-Native American man has ever been subjected to this type of treatment by Yale.

158. On information and belief, prior to John, no other Yale student had been expelled based on a claim of violation of the policy on sexual misconduct. A review of precedent files relating to similar allegations against Yale students before the 2014 school year revealed that no similarly situated student had been expelled for sexual misconduct. On information and belief, other students formally accused of sexual misconduct using force have been given no more than a four (4) semester suspension.

159. On information and belief, a Yale student accused of attempted murder of another Yale student by strangulation was not barred from Yale campus nor was he arrested at gunpoint by four YUPD officers.

160. On or about July 30, 2014, the Dean of Native Students left Yale for a position as an Associate Professor at another University after being told by Yale that he would be reassigned to "other duties" in the administration building. On information and belief, the Dean of Native Students was removed because Dorame, Accuser and their confederates had conspired to have him removed based on his support for John and his tribal affiliation.

23

161.    On information and belief, John was accused by Accuser of sexual misconduct because Dorame, Accuser and Brown wanted him eliminated as an obstacle to control of the NACC because of his support for the Dean of Native Students.

## K.    John's Academic Career, Professional Future, And Reputation Have Been And Will Continue To Be Severely Damaged By Yale's Wrongful Conduct.

162.    Despite John's sterling academic record, significant contributions to the Yale community through his extracurricular activities, and Accuser's unquestioned and varying accounts of his alleged misconduct, Yale imposed the most severe sanction on him, after a sham process that denied him basic due process rights and violated Yale's own policies and procedures governing sexual misconduct proceedings.

163.    Upon information and belief, John's case was the first sexual misconduct matter before the UWC following the complaints filed with the Department of Education and negative news coverage concerning the College's handling of the former Yale quarterback's sexual misconduct allegations.

164.    John's decision was rendered and appeal denied based on his gender and his Native American and Filipino ancestry.

165.    John was a male accused of sexual misconduct at the wrong time and in the wrong place.

166.    John was considered an "easy target" by Yale because almost all Native American students at Yale are perceived by Yale to be poor and without resources to actively fight Yale's discriminatory acts.

167.    John was also the whipping boy that Yale needed to demonstrate its new "zero tolerance" standard to deal with allegations of sexual misconduct even though the facts of John's case did not warrant discipline at all, and it certainly did not warrant the consequences that were unjustly imposed.

168.    The investigation against John was biased, conclusory and essentially a "witch hunt" and he was expelled based on his gender and Native American and Filipino ancestry, as Yale rendered its decision regarding his status and imposed the most severe sanction in the

absence of any corroborating evidence and in flagrant disregard of the College's own policies and procedures.

169.    As a result of Yale's actions, John's academic and professional prospects have been shattered, and his economic future has been severely compromised.  In his attempt to continue his academic pursuits, John made inquiries to numerous colleges and universities about their transfer and admission policies.  The vast majority of these institutions informed John that their policies explicitly forbid the acceptance of students who have been expelled from a college or university.  Other institutions with less strict policies have informed John that, if his record indicates a finding of sexual misconduct, he will not be admitted, regardless of his grades, test scores, community activities, or the circumstances surrounding his case.

170.    John has applied to twenty-eight institutions without bright-line rules concerning disciplinary records and sexual misconduct findings where he has any chance of being accepted. John disclosed Yale's findings concerning his interactions with Accuser to all of these institutions, as required by their respective applications.

171.    Despite his first-rate academic record and otherwise unblemished disciplinary history, John has been rejected from the majority of the colleges and universities that have responded to his application, and he has not received any information regarding his application status at others that are aware of the UWC hearing, the Panel's findings, and the severe sanction imposed. Moreover, John is required to enroll at any new university as an incoming junior, which forces him to take, and pay tuition for, an additional year of undergraduate education.

### First Cause of Action

*Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, et seq.*

[By John Against All Defendants]

172.    John incorporates by reference each of the paragraphs above as if fully set forth herein.

173.    Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1981, et seq. ("Title IX"), provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

Title IX is enforceable through an applied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

174.    Title IX applies to Yale because it receives federal funding in various forms, including, but not limited to, grants and federal student loans provided to Yale by its students or given to Yale by the federal government directly.

175.    Yale's treatment of John abridged the protection afforded by Title IX in numerous ways as identified in the background facts allege above and as specifically denominated, without limitation, as follows:

A.    Yale discriminated against John, on the basis of his sex, through discriminatory, gender-biased implementation of Yale's policies and procedures in the wake of scathing media reports and federal complaints against the College.

B.    Yale initiated and conducted the investigation and subsequent hearing in a manner that was biased against John due to his gender. Yale was under fire and subject to federal investigation for mishandling sexual misconduct complaints, and John, on information and belief, as the first male student facing such charges before the College's judicial system in the aftermath of this criticism, was subjected to bias in an effort to overcorrect past indiscretions and was found to have committed these offenses absent any credible evidence of wrongdoing.

C.    At the hearing, the UWC Panel impermissibly allowed Accuser to admit a previously undisclosed statement into evidence and permitted Accuser to leave the hearing during John's testimony. All of these actions violate the UWC policies and procedures, and demonstrate the Panel's discriminatory bias against the accused based on his gender. Further demonstrating its discriminatory bias, the Panel unjustifiably discounted or ignored the inconsistencies in Accuser's accounts of what had occurred, the lack of physical, medical, or other corroborating evidence, the uncontested fact that Accuser initiated consensual sexual intercourse immediately before the alleged incident at issue, and that she did not at any time state that she had told John that she did not want to continue the consensual sexual events.

D.    Even assuming *arguendo* that Yale had complied with its policies and procedures, such rules afford varying rights to women and men as in virtually all cases of alleged sexual misconduct at Yale, the accused student is a male and the accusing student is a female.

E.     John was singled out and treated in a disproportionately harsh manner. On information and belief, a female student at Yale has never been disciplined, much less expelled, for alleged sexual misconduct.

F.     Due to his gender, Yale imposed sanctions on John that were excessively severe, especially in light of Accuser's inconsistent testimony, the lack of physical, medical, or other corroborating evidence, and the long passage of time between the alleged sexual misconduct and the hearing.

176.    In addition to the foregoing specific allegations, Yale's policies and procedures as promulgated and carried out deprived John, on the basis of his sex, of basic due process and equal protection rights as they do not allow for the presence of legal counsel to aid in the defense of sexual misconduct charges and deny a student accused of sexual misconduct the right to confront and/or cross-examine his accuser.

177.    As a direct and proximate consequence of Yale's Title IX violations, John has sustained significant damages including, but not limited to, the following:

A.     John suffers from having an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual misconduct, harassment and/or other related offenses. This black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he now has a record that notes findings of guilt for conduct he did not commit.

B.     John has also suffered monetary damages, emotional distress, loss of educational opportunities, and other direct and consequential damages.

C.     As a direct and proximate consequence of Yale's Title IX violations, John has lost any and all moneys he has paid to obtain a Yale degree (including but not limited to, tuition, living expenses, books, transportation costs) since he enrolled in 2009, as he was forced to leave the College before his senior year without a certificate of graduation.

178.    John is entitled to equitable relief in the form of a preliminary and permanent mandatory injunction to provide the following relief:

A.       Mandate that Yale correct John's academic and/or disciplinary record to remove any findings issued by the College with respect to the charges levied against him by Yale and/or Accuser;

B.       Mandate that Yale verify this correction by providing John with a notarized letter confirming that any findings with respect to these charges have been expunged from John's academic and/or disciplinary record; and

C.       Mandate that Yale immediately allow John to reenroll in the College to complete his senior year of education.

D.       Award John any other and further relief that the Court deems just and proper.

## Second Cause of Action

*Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq.*

[By John Against All Defendants]

179.     John incorporates by reference each of the paragraphs above as if fully set forth herein.

180.     Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d,[1] prohibits discrimination on the basis of race, color or national origin by a recipient of federal funds against the participants in (or beneficiaries of) any program or activity receiving federal financial assistance conducted by the recipient.

181.     Section 601 provides a private right of action for intentional discrimination. To plead a claim for Title VI, plaintiff must allege that (1) defendant engaged in racial or national origin discrimination, and (2) defendant receives federal financial assistance.

182.     Basic Educational Opportunity Grants paid directly to students because of their enrollment at a school subject the school to Title VI coverage. Title VI includes Basic

---

[1] Section 601 of Title VI, 42 U.S.C. § 2000d, provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

Educational Opportunity Grants and Guaranteed Student Loans. John received federal student loans.

183. Title VI applies to Yale because it receives federal funding in various forms, including, but not limited to, grants and federal student loans provided to Yale by its students or given to Yale by the federal government directly.

184. Yale's treatment of John abridged the protection afforded by Title VI in numerous ways as identified in the background facts alleged above and as specifically denominated, without limitation, as follows:

A. Yale discriminated against John, on the basis of his race and national origin, through discriminatory implementation of Yale's policies and procedures in the wake of scathing media reports and federal complaints against Yale because John was perceived as an "easy target" based on his race. John was perceived as an easy target because the majority of Native American students at Yale are from economically disadvantaged families and many are on full scholarships without the means to support litigation or mount an effective defense to the discriminatory policies and practices engineered by Yale against John.

B. From the moment the YUPD entered John's dormitory room, with weapons drawn, and placed John on the floor face down, with those weapons pointed at him, the discriminatory attitude of Yale towards John was evident.

C. Yale then initiated and conducted the investigation and subsequent hearing in a manner that was biased against John due to his race and national origin. Yale was under fire and subject to federal investigation for mishandling sexual misconduct complaints, and John, on information and belief, as the first male student facing such charges before the College's judicial system in the aftermath of this criticism, was subjected to bias in an effort to overcorrect past indiscretions and was found to have committed these offenses absent any credible evidence of wrongdoing in part because of his race and national origin.

D. At the hearing, the UWC Panel impermissibly allowed Accuser to admit a previously undisclosed statement into evidence and permitted Accuser to leave the hearing during John's testimony. All of these actions violate the UWC policies and procedures, and demonstrate the Panel's discriminatory bias against the accused. Further demonstrating its

29

discriminatory bias, the Panel unjustifiably discounted or ignored the inconsistencies in Accuser's accounts of what had occurred, the lack of physical, medical, or other corroborating evidence, the uncontested fact that Accuser initiated consensual sexual intercourse immediately before the alleged incident at issue, and that she did not at any time state that she had told John that she did not want to continue the consensual sexual events.

E.     John was singled out and treated in a disproportionately harsh manner because of his race and national origin. On information and belief, no non-minority student at Yale had ever been disciplined, much less expelled, for alleged sexual misconduct prior to John's expulsion.

F.     John was singled out and treated in a disproportionately harsh manner because of his race and national origin. On information and belief, no non-minority student (and perhaps no student of any race or national origin) at Yale had ever been arrested at gunpoint in his dormitory room based on allegations of any nature by another student, in the 300 year history of the institution prior to John's arrest.

G.     John was singled out and treated in a disproportionately harsh manner because of his race and national origin. On information and belief, no non-minority student (and perhaps no student of any race or national origin) at Yale had ever been barred from campus, even when criminal charges were pending, based on allegations of sexual misconduct by another student.

H.     John was singled out and treated in a disproportionately harsh manner because of his race and national origin. On information and belief, no non-minority student (and perhaps no student of any race or national origin) at Yale had ever been barred from campus, when facing criminal charges.

I.     Due to his race and national origin, Yale imposed sanctions on John that were excessively severe, especially in light of Accuser's inconsistent testimony, the lack of physical, medical, or other corroborating evidence, and the long passage of time between the alleged sexual misconduct and the hearing.

185.    In addition to the foregoing specific allegations Yale's policies and procedures as promulgated and carried out deprived John, on the basis of his race and national origin, of basic

30

due process and equal protection rights as they do not allow for the presence of legal counsel to aid in the defense of sexual misconduct charges and deny a student accused of sexual misconduct the right to confront and/or cross-examine his accuser.

186.    As a direct and proximate consequence of Yale's Title VI violations, John has sustained significant damages including, but not limited to, the following:

A.    John suffers from having an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual misconduct, harassment and/or other related offenses.  This black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he now has a record that notes findings of guilt for conduct he did not commit.

B.    John has also suffered monetary damages, emotional distress, loss of educational opportunities, and other direct and consequential damages.

C.    As a direct and proximate consequence of Yale's Title VI violations, John has lost any and all moneys he has paid to obtain a Yale degree (including but not limited to, tuition, living expenses, books, transportation costs) since he enrolled in 2009, as he was forced to leave the College before his senior year without a certificate of graduation.

187.    John is entitled to equitable relief in the form of a preliminary and permanent mandatory injunction to provide the following relief:

A.    Mandate that Yale correct John's academic and/or disciplinary record to remove any findings issued by the College with respect to the charges levied against him by Yale and/or Accuser;

B.    Mandate that Yale verify this correction by providing John with a notarized letter confirming that any findings with respect to these charges have been expunged from John's academic and/or disciplinary record; and

C.    Mandate that Yale immediately allow John to reenroll in the College to complete his senior year of education and award John any other and further relief that the Court deems just and proper.

### Third Cause of Action

*Breach of Contract*

[By John Against All Defendants]

188.    John incorporates by reference each of the paragraphs above as if fully set forth herein.

189.    At all times relevant hereto, a contractual relationship existed between Yale and John through, inter alia, Yale's Student Handbook and Undergraduate Regulations.  Yale was required to act in accordance with the Student Handbook and Undergraduate Regulations in addressing complaints of sexual misconduct, conducting investigations of such complaints, adjudicating sexual misconduct charges, and deciding requests for appeal.

190.    John performed all duties and obligations required of him except those that were excused and/or rendered impossible or impracticable by Defendants.

191.    For all the reasons set forth above, Yale has materially breached its contracts with John by failing to comply with policies and procedures governing sexual misconduct proceedings set forth in the Student Handbook and Undergraduate Regulations.

192.    As a direct and proximate consequence of Yale's numerous material breaches of Title IX, John has sustained significant damages including, but not limited to, the following:

A.      John suffers from having an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual misconduct, harassment and/or other related offenses.  This black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he now has a record that notes findings of guilt for conduct he did not commit.

B.      John has also suffered monetary damages, emotional distress, loss of educational opportunities, and other direct and consequential damages.

C.      John has lost any and all moneys he has paid to obtain a Yale degree (including but not limited to, tuition, living expenses, books, transportation costs) since he enrolled in 2009, as he was forced to leave the College before his senior year without a certificate of graduation.

193.    In addition to monetary damages, John is entitled to an award of specific performance, including a preliminary and permanent mandatory injunction to provide the following relief:

    A.    Mandate that Yale correct John's academic and/or disciplinary record to remove any findings issued by the College with respect to the charges levied against him by Yale and/or Accuser;

    B.    Mandate that Yale verify this correction by providing John with a notarized letter confirming that any findings with respect to these charges have been expunged from John's academic and/or disciplinary record; and

    C.    Mandate that Yale immediately permit John to reenroll in the College to complete his senior year of education

    D.    Award John any other and further relief that the Court deems just and proper.

### Fourth Cause of Action

*Promissory Estoppel*

[By John Against All Defendants]

194.    John incorporates by reference each of the paragraphs above as if fully set forth herein.

195.    Defendants made clear and unambiguous promise to honor and abide by the substantive and procedural requirements of Yale's Student Handbook and Undergraduate Regulations.

196.    John relied on Defendants' promise to honor and abide by the substantive and procedural requirements of Yale's Student Handbook and Undergraduate Regulations by enrolling and continuing to attend Yale, by conforming his personal behavior to the standards required in Yale's Student Handbook and Undergraduate Regulations, and by participation in and investigatory process that he reasonably believed would be consistent with the requirements of Yale's Student Handbook and Undergraduate Regulations.

197.    John's reliance was reasonable and foreseeable based on the nature of the promises themselves, Yale's history and reputation and on the public knowledge of the processes and supposed protection afforded to Yale students, including John at the time.

198.    John justifiably relied on Yale's express and implied promises to his detriment, as Yale failed to adhere to its regulations, standards, procedures and policies and did, in fact, discriminate against him by failing to provide him with the rights set forth in the Student Handbook and Undergraduate Regulations.

199.    As a direct, proximate and foreseeable consequence of Yale's failure and refusal to abide by the terms of its promises, John has sustained significant damages including, but not limited to, the following:

A.    John suffers from having an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual misconduct, harassment and/or other related offenses. This black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he now has a record that notes findings of guilt for conduct he did not commit.

B.    John has also suffered monetary damages, emotional distress, loss of educational opportunities, and other direct and consequential damages.

C.    John has lost any and all moneys he has paid to obtain a Yale degree (including but not limited to, tuition, living expenses, books, transportation costs) since he enrolled in 2009, as he was forced to leave the College before his senior year without a certificate of graduation.

200.    In addition to monetary damages, Defendants should be estopped from continuing to injury and damage John, and John is entitled to equitable relief, including a preliminary and permanent mandatory injunction to provide the following relief:

A.    Mandate that Yale correct John's academic and/or disciplinary record to remove any findings issued by the College with respect to the charges levied against him by Yale and/or Accuser;

34

      B.      Mandate that Yale verify this correction by providing John with a notarized letter confirming that any findings with respect to these charges have been expunged from John's academic and/or disciplinary record; and

      C.      Mandate that Yale immediately permit John to reenroll in the College to complete his senior year of education

      D.      Award John any other and further relief that the Court deems just and proper.

## Fifth Cause of Action

### *Negligence*

[By John Against All Defendants]

201.    John incorporates by reference each of the paragraphs above as if fully set forth herein.

201.    By virtue of the foregoing, including without limitation, the duties imposed by law and the duties Defendants accepted by promulgating Yale's Student Handbook and Undergraduate Regulations, Defendants had a duty to John to treat him fairly, free from discrimination, and to adjudicate complaints and disputes with fair and due process.  In particular, these general duties included, without limitation, the specific duties: (a) To ensure that its policies and procedures concerning sexual misconduct are fair and reasonable; (b) to ensure that its policies and procedures concerning sexual misconduct are compliant with applicable federal/state law, namely, but not limited to, Title IX; (c) to adequately train its administration, staff, employees and representatives of such policies and procedures concerning sexual misconduct and the cultural norms and politics of Native Americans; and (d) to ensure that its administration, staff, employees and representatives adhere to such policies and procedures.

203.    Based on the aforementioned facts and circumstances, Yale has breached its duties of care owed to John.

204.    As a direct, proximate and foreseeable consequence of Defendants' negligence, John has sustained significant damages including, but not limited to, the following:

      A.      John suffers from having an academic and/or disciplinary record(s) that improperly includes a notation indicating that he was found to have committed sexual

misconduct, harassment and/or other related offenses.  This black mark on John's record inhibits or destroys his ability to enroll in a similarly ranked and esteemed college or university and stigmatizes John as he now has a record that notes findings of guilt for conduct he did not commit.

B.      John has also suffered monetary damages, emotional distress, loss of educational opportunities, and other direct and consequential damages.

C.      John has lost any and all moneys he has paid to obtain a Yale degree (including but not limited to, tuition, living expenses, books, transportation costs) since he enrolled in 2009, as he was forced to leave the College before his senior year without a certificate of graduation.

**WHEREFORE,** John prays for a jury trial on all claims for which the law permits a jury and for damages and equitable relief against Defendants, jointly and severally, as follows:

1.      On each appropriate cause of action, for special and compensatory damages proven at trial but in no even less than the jurisdictional minimum for this Court.

2.      On each appropriate cause of action, for general damages proven at trial but in no even less than the jurisdictional minimum for this Court.

3.      On the first and second causes of action, for equitable relief in the form of a preliminary and permanent mandatory injunction to provide the following relief:

A.      Mandate that Yale correct John's academic and/or disciplinary record to remove any findings issued by the College with respect to the charges levied against him by Yale and/or Accuser;

B.      Mandate that Yale verify this correction by providing John with a notarized letter confirming that any findings with respect to these charges have been expunged from John's academic and/or disciplinary record; and

C.      Mandate that Yale immediately allow John to reenroll in the College to complete his senior year of education

D.      Award John any other and further relief that the Court deems just and proper.

4.      On the third cause of action, for an award of specific performance, including a preliminary and permanent mandatory injunction to provide the following relief:

      A.     Mandate that Yale correct John's academic and/or disciplinary record to remove any findings issued by the College with respect to the charges levied against him by Yale and/or Accuser;

      B.     Mandate that Yale verify this correction by providing John with a notarized letter confirming that any findings with respect to these charges have been expunged from John's academic and/or disciplinary record; and

      C.     Mandate that Yale immediately permit John to reenroll in the College to complete his senior year of education

      D.     Award John any other and further relief that the Court deems just and proper.

    5.     On the fourth cause of action, for and Order stating that Defendants are estopped from continuing to injury and damage John and that John is entitled to equitable relief, including a preliminary and permanent mandatory injunction to provide the following relief:

      A.     Mandate that Yale correct John's academic and/or disciplinary record to remove any findings issued by the College with respect to the charges levied against him by Yale and/or Accuser;

      B.     Mandate that Yale verify this correction by providing John with a notarized letter confirming that any findings with respect to these charges have been expunged from John's academic and/or disciplinary record; and

      C.     Mandate that Yale immediately permit John to reenroll in the College to complete his senior year of education

      D.     Award John any other and further relief that the Court deems just and proper.

    6.     On each appropriate cause of action, for interest permitted by law.

    7.     On each appropriate cause of action, for attorney's fees permitted by law of contract;

    8.     For costs.

    9.     And for any further and additional relief permitted by the facts and applicable law as permitted by the Court.

**PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SUBJECT TO JURY RIGHT**

PLAINTIFF, JOHN DOE

By_____/s/_____

Frederick M. O'Brien ct08989
Pattis & Smith LLC
383 Orange Street
1st Floor
New Haven, CT 06511
(203) 393-3017 Phone
(203) 393-9745 Fax
fobrien@pattisandsmith.com
His Attorney

## CERTIFICATION OF SERVICE

The undersigned certifies that on this 18th day of May, 2016, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties who have appearances as of the time of this filing, by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/Frederick M. O'Brien  ct08989/s/